Filed 7/13/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B241172 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA357423) |
| v. | |
| STEPHANIE ILENE LAZARUS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge. Affirmed.

Donald R. Tickle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Stephanie Ilene Lazarus, a 25-year veteran of the Los Angeles Police Department (LAPD), was charged and convicted of first degree murder in the shooting death of Sheri Rasmussen, the wife of appellant's former lover, John Ruetten. The 1986 crime was not solved until 2009, when a DNA profile obtained from a bite mark on Rasmussen's arm was matched to appellant. At trial, the prosecution established that appellant had been in love with Ruetten and was emotionally devastated when she learned of his and Rasmussen's 1985 engagement. She went to Ruetten in tears, begging him to reconsider, and later confronted Rasmussen at work. The bullets used to kill Rasmussen were of the type then used by LAPD officers, and were discharged from a gun similar to one owned by appellant, which she declared stolen two weeks after the shooting. The jury found appellant guilty, and she was sentenced to 27 years to life.

Appellant raises the following contentions on appeal: (1) the pre-accusation delay violated her due process rights; (2) the trial court erred in denying a defense motion to quash search warrants used to search appellant's home and computers; (3) the trial court erred in denying a defense motion to traverse the search warrants; (4) the trial court erred in admitting a tape of appellant's pre-arrest interview by LAPD detectives; (5) the trial court erred in failing to hold a *Kelly* hearing before admitting evidence of partial DNA profiles from material found on the victim's fingernails developed through use of a "MiniFiler" DNA test kit;[1] and (6) the trial court erred by failing to allow the defense to introduce evidence of a burglary that occurred in the area six weeks after the murder, and by preventing the defense from cross-examining the prosecution's crime scene expert about the burglary. Finding no prejudicial error, we affirm.

---

[1] *People v. Kelly* (1976) 17 Cal.3d 24.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *Information*

By information dated December 18, 2009, appellant was charged with the willful, deliberate, and premeditated murder of Sheri Rasmussen on February 24, 1986 (Pen. Code, § 187, subd. (a)). It was further alleged that appellant personally used a handgun in the commission of the offense.

B. *Evidence at Trial*

1. *Prosecution Evidence*

On February 24, 1986, Rasmussen lived in a condominium on Balboa Street in Van Nuys with her husband John Ruetten and worked as a nurse at a Glendale hospital. Ruetten left for work at 7:20 that morning. Rasmussen called in sick. Both Ruetten and Rasmussen's sister tried to call Rasmussen at home several times that day, beginning at approximately 10 a.m., but Rasmussen did not answer. At approximately 9:45, a neighbor, Anastasia Volanitis, noticed the garage to Rasmussen's condominium was open with no cars inside.[2] When Ruetten returned home at 6:00 p.m., he noticed the garage door was open and Rasmussen's BMW was missing.[3] There was broken glass on the driveway from a shattered sliding glass patio door. The door from the condominium to the garage, which Ruetten

---

[2]     At around noon, Volanitis received Rasmussen's purse from two Hispanic men whom she believed to be gardeners. Volanitis and her husband turned the purse over to police officers later that day.

[3]     Rasmussen's BMW was recovered on March 7, 1986, 2.5 miles from her home, with the keys in the ignition switch. It was not stripped or otherwise damaged.

had closed and locked when he left that morning, was ajar.[4] Rasmussen was lying dead on the living room floor, still wearing her sleep shirt and robe.

The pathologist who examined Rasmussen declared the cause of death to be three gunshots to her chest, all fatal. One was a contact wound and at least one was inflicted while she was lying on the floor or against a similar hard surface. There were abrasions on Rasmussen's arms, near the wrist, consistent with injury from a rope or cord.[5] There were signs that Rasmussen had struggled with her assailant, including multiple contusions, lacerations and abrasions on her hands, mouth, face, head and neck. Broken pieces of two of Rasmussen's fingernails were found on the floor near the condominium's front door. An injury on her face was consistent with a blow from the muzzle of a gun, with a size and configuration matching a .38 caliber Smith & Wesson revolver. There was a blow to her head consistent with a broken vase found near her body.[6] On Rasmussen's left inner forearm was an apparent bite mark. The pathologist examined it under a microscope. Based on the amount of hemorrhaging and the absence of inflammation, she determined that the injury had been inflicted at or about the time of Rasmussen's death.[7]

---

[4]    Ruetten had not checked the front door before leaving and did not know whether it was locked. The condominium had a burglar alarm, but Ruetten did not believe it was turned on when he left.

[5]    A white cord/rope with a blood stain was found near the front door. The blood was identified as Rasmussen's.

[6]    None of the head injuries was fatal.

[7]    Cathy Law, the chief forensic dentist for the coroner's office, testified the mark appeared to be a bite mark, but she could not be certain unless amylase, an enzyme found in saliva, was present. As will be discussed, DNA examiners detected the presence of salivary amylase on the mark.

Based on distinct physical characteristics, experts in the field of identifying ammunition testified at trial that bullets recovered in or near Rasmussen's body were ".38J Plus-P" ammunition, manufactured by Federal. In 1986, LAPD officers were required to use Federal .38J Plus-P ammunition, even when off duty and carrying a personal weapon.

A sleeved quilt found near Rasmussen's body was taken into evidence and examined. The presence of multiple bullet holes and gunshot residue on the quilt led authorities and experts to conclude that it had been wrapped around the assailant's weapon to dampen the sound of the gunshots. At trial, a forensic firearms expert testified that based on the location of the bullet holes in relation to linear gunshot residue that appeared to have been discharged from the cylinder, the weapon was a revolver with a two-inch barrel. Any number of guns were capable of firing the bullets found at the crime scene, but less than a dozen had two-inch barrels.

Criminalist Lloyd Mahaney took samples from the bite mark on Rasmussen's arm at the scene.[8] Investigators and criminalists also collected the two broken fingernails found near the condominium's front door, clippings from Rasmussen's remaining fingernails, and samples of tissue and debris from the underside of the fingernails. Additional items and samples were collected at the scene and from the interior of the BMW, including multiple fingerprints, multiple samples of what appeared to be blood, and multiple hairs.[9]

---

[8] The samples were taken by moistening the area with distilled water and wiping it with cotton-tipped swabs. The swabs were placed in an enclosed tube, which had air holes to allow the samples to dry out. The tube was sealed in an envelope and placed in one of the freezers located in the evidence room at the coroner's office.

[9] The fingerprints were obtained from the BMW and various places near where Rasmussen's body was found, including the front door, the door between the living room

*(Fn. continued on next page.)*

Stereo equipment had been pulled from a cabinet inside the condominium's living room and stacked by the door to the garage. A drawer in a living room table had been pulled out and the contents dumped on the floor. Although there was no evidence of forced entry, and rooms containing other valuables -- including additional stereo equipment -- were undisturbed, the detectives who initially investigated the crime concluded that the murder was committed in the course of a burglary. Specifically, they theorized that one or two burglars had came in through an open door, were surprised by Rasmussen's presence, and shot her during a struggle over a gun.[10]

_____

and the garage, a banister, a VCR, a CD player, and a cassette deck. The samples of blood stains were taken from the front door, a closet door, near a wall socket, the door leading to the garage, the floor near the entryway, and the BMW's ignition key, interior door handle, and driver's side door. Photographs were taken of a red stain on the stereo equipment stacked near the door and a bloody smudge on a nearby wall that could have been from someone's hand, but no identifiable fingerprints were developed from either source. Not all of the lifted prints were identifiable but of those that were, none matched appellant's. The LAPD lab did not test all of the apparent blood stain samples for DNA, but in the samples that were tested, the DNA was matched to or consistent with Rasmussen's. None matched appellant. An independent lab tested some of the remaining blood stain samples and found DNA from three individuals in the one found on the BMW's door handle. One of the DNA profiles was consistent with Rasmussen's, but neither appellant nor Ruetten were possible matches with the others. The DNA mixture could have come in part from casual contact with the door handle. The independent lab also found mixtures of male and female DNA on the quilt found near Rasmussen: the female DNA was consistent with Rasmussen's, the male DNA was not identified. None of the hairs analyzed was appellant's. One of the hairs, found entangled in speaker wire near the white cord, was from a male who was not John Ruetten.

[10]  Mark Safarik, a crime scene analyst called by the prosecution, testified the crime scene had been staged to look like a burglary. He testified that Rasmussen's condominium was an unlikely target for an experienced burglar, as it was in a gated complex surrounded by a fence, was centrally located within the complex, and had an alarm system. He opined that the absence of evidence of a forced entry, along with the fact that little property had been taken or set aside and that very little inside the condominium had been disturbed, suggested the motivating crime was not burglary. He

*(Fn. continued on next page.)*

In December 2004, members of LAPD's cold case unit re-opened the case, asking the coroner's office to locate the bite mark tissue sample, which had been in a freezer in the coroner's evidence room since 1986.[11] In 2005, Jennifer Francis, a criminalist with LAPD, examined a piece of one of the swabs under a microscope and also performed DNA testing on it. Under the microscope, she saw nucleated epithelial cells, which are found in large numbers in saliva and provide a good medium for obtaining a complete DNA profile. The DNA testing indicated the presence of two profiles: a major profile and a minor profile. The minor profile was consistent with Rasmussen's, although there was insufficient material for a complete match.[12] The major profile was complete. The DNA that comprised the major profile was from a female.

Authorities initially attempted to find a match by uploading the major DNA profile from the bite into a national database system. This was unsuccessful. In 2009, the investigation turned toward specific women who might have had reason to harm Rasmussen. LAPD officers surreptitiously obtained a sample of

explained that a burglar would generally plan to arrive when no one was home; the fact that the crime occurred early in the day and the perpetrator brought a white rope indicated burglary was not the motive. He further explained that burglars do not generally steal vehicles. However, as the BMW had been taken, Safarik found it unusual that nothing of value was removed from it. Finally, the fact that the stereo equipment was found stacked near where the struggle appeared to have taken place, but was undisturbed, suggested it was placed there after the fact.

[11] When it was found, the envelope in which the tube had been sealed was torn but the tube inside appeared intact. There were two swabs inside the tube.

[12] As will be discussed in greater detail in part E of the Discussion, *infra*, the DNA test kits used by Francis, called Profiler Plus and COfiler, assigned numerical values to patterns of repeating DNA inherited from each parent at 13 points or "loci" along the chromosome. If the particular tissue sample tested contained insufficient cellular material, the test kits were unable to assign numbers at all 13 loci, and the profile was considered incomplete or partial.

appellant's DNA by taking possession of a drink cup and straw discarded by appellant. LAPD criminalist Michael Mastrocovo developed a partial DNA profile for the drink cup and straw. Appellant's DNA profile matched the major profile found on the bite mark.[13]

Appellant was arrested on June 5, 2009. A criminalist swabbed her mouth in order to develop a complete DNA profile. Francis analyzed the DNA on one of those swabs. Appellant's DNA profile matched the major profile on the bite mark swab at 13 loci.[14]

In 2010, Thomas Fedor, a serologist for an independent forensics laboratory, Serological Research Institute (SERI), was provided the second bite mark swab. Several persons were present when he tested it, including a representative for the defense. Fedor began by placing the swab into a solution and analyzing the resulting liquid. It contained salivary amylase. When he performed DNA testing, he detected, just as Francis had, the presence of two distinct DNA profiles, one major and one minor.[15] The minor profile was consistent with Rasmussen's. Fedor separately tested the swab obtained from appellant to obtain appellant's

---

[13]     The DNA test kit used by Mastrocovo, called Identifiler, was designed to assign numerical values to patterns of repeating DNA at up to 15 loci, the 13 in the test used by Francis when she first tested the bite mark swab, plus two more. The DNA sample obtained from the drink cup and straw contained insufficient material to assign values at all 15 loci. The 11 points or loci at which readings were obtained from the DNA on the drink cup and straw matched the profile from the bite mark.

[14]     When testing the swab taken from appellant's mouth, Francis used the Identifiler test kit, obtaining readings at 15 points for appellant's DNA profile. But as she had used the Profiler Plus/COfiler test kits when testing the bite mark tissue sample in 2005, she had only 13 points on that profile to use for comparison purposes. Francis calculated that a match at 13 loci would be expected in one out of 402 quadrillion unrelated individuals.

[15]     Fedor used the Identifiler test kit, capable of obtaining readings at 15 loci.

DNA profile. Appellant's DNA profile matched the major profile Fedor obtained from the bite mark swab at all 15 loci.[16]

Fedor also analyzed tissue samples found on or under Rasmussen's fingernails using a MiniFiler test kit. Under one fingernail, he found a mixture of DNA and obtained partial profiles for at least three people. One of the partial profiles was consistent with appellant's.[17] Fedor found low levels of DNA under three other nails with profiles consistent with appellant's.[18] There were minute amounts of DNA material under six other fingernails contributed by both males and females, some of which was inconsistent with Rasmussen's. Fedor was able to rule out appellant and Ruetten as possible contributors.[19]

In 1986, appellant was an LAPD police officer in the Devonshire Division, having entered the police academy in 1983 and graduated in 1984. Brian McCartin, who attended the academy with appellant, described her as "the strongest, most aggressive, most persistent fighter" of the women in the class. Michael Hargreaves, appellant's friend and former roommate and a former police officer, described her fitness level as "outstanding" and her level of strength with

---

[16]    Fedor computed that the chance a woman unrelated to appellant would have the same DNA profile at all 15 loci was approximately one in 1.7 sextillion, many times the population of the earth.

[17]    Because it was only a partial profile, Fedor calculated that one out of every 26,000 women could have matched it.

[18]    One of the profiles would also have been consistent with the DNA profiles of one out of 9,000 other women, the others were consistent with the profiles of one out of nine or ten other women.

[19]    Fedor testified that small amounts of another person's DNA can be deposited under a fingernail through casual encounters or by touching objects containing that person's DNA. Another witness testified that scissors used to collect fingernails in 1986 were not sterilized between uses because investigators were not anticipating the material being subjected to DNA testing or the significance of minor amounts of contamination.

respect to other women as "superior." Hargreaves also testified that appellant was an "expert" level shooter. Sometime between 1985 and 1987, appellant showed her friend and fellow police officer Jayme Weaver lock picking tools and told Weaver she had learned how to use them.[20]

In 1986, it was common practice for LAPD officers to carry a backup weapon in addition to the weapon issued them by the department. Officers were expected to let the LAPD armorer know when they purchased a backup weapon. They were permitted to carry only guns that could be used with the Federal .38J Plus-P bullets. Records from the armorer's office indicated that on February 29, 1984, appellant purchased a .38 caliber Smith and Wesson Model 49 revolver.[21] It was a five shot model.[22] Its barrel was approximately two inches. On March 9, 1986, less than two weeks after Rasmussen's death, appellant reported to the Santa Monica Police Department that her Smith & Wesson Model 49 revolver had been stolen from the glove compartment of her car while parked in Santa Monica. Hargreaves, appellant's former roommate, recalled appellant telling him she had lost her revolver a few days earlier in Santa Monica while carrying it in a bag or fanny pack. She asked him how to go about reporting it. When appellant reported her gun stolen in Santa Monica, she told the officer at the front desk it had been stolen that day. There was no record indicating appellant had reported the theft to

---

[20]     A search of appellant's home uncovered appellant's daily planner which mentioned two books on locksmithing and lock picking. The books themselves were not found.

[21]     Appellant's purchase of the weapon was also documented by the record of the Los Angeles Police Revolver and Athletic Club, which sold guns to peace officers.

[22]     Rasmussen had been shot three times. In addition, there were two bullet holes in the curtains covering the shattered sliding glass door, indicating two additional bullets had been fired.

the LAPD armorer.  She did, however, report to the armorer buying another gun, a different model, on March 19, 1986.

Appellant and Ruetten had met in college and dated casually in the late 1970's.  After graduation, between 1981 and 1984, they continued to date and were sexually intimate, but Ruetten did not consider her his girlfriend.  In June 1984, Ruetten met Rasmussen.  In May 1985, Ruetten and Rasmussen became engaged.  In June 1985, appellant learned of Ruetten's engagement and called him, upset and crying.  She asked Ruetten to come to her condominium.  When he arrived, appellant, still crying, told Ruetten she was in love with him.  She repeatedly asked him to have sex with her, and he did.

Following this encounter, Ruetten continued his relationship with Rasmussen, and several weeks later they moved in together.  Sometime after Ruetten and Rasmusssen were living together, appellant went to the hospital where Rasmussen worked and confronted her.  That evening, Rasmussen came home upset, and Ruetten confessed to having had sex with appellant after their engagement; it appeared Rasmussen already knew.  Ruettan promised not to have any further contact with appellant.  Ruetten and Rasmussen were married in November 1985.

Appellant told Hargreaves she was in love with "John."  On one occasion while they were roommates, sometime between late 1984 or early 1985 and February 1986, she woke Hargreaves late at night.  She was crying and wanted Hargreaves to console her.  She told him that "John" had broken up with her and was going to marry someone else.  Appellant became sad and more easily upset after the breakup.  Appellant told Hargreaves that she had gone to the hospital where Ruetten's fiancée worked and had a confrontation with her.  When discussing why she did not date for an extended period after the break up, appellant

11

told Hargreaves she was "picky" and preferred men who were "tall" and "athletic," "like John."

Appellant's home was searched in June 2009. Her journal and daily planners were retrieved, along with some photographs of Ruetten. The journal covered the period between November 1984 and August 1986. An entry for November 1984 discussed a night out that "kept my mind off John for a while anyway." An entry for April 1985 stated that appellant "saw John Ruetten's car," "put a note on it," "watched [it] for one half hour and checked up on it a few times." An entry for May 1985 mentioned visiting Ruetten and his girlfriend being there. An entry for June 1985 stated that appellant had found out Ruetten was getting married; she described herself as "very depressed" and her concentration as "negative 10." Another entry for June 1985 stated: "Didn't feel like working. Too stressed out about John. I've had a real hard time concentrating these days so I called up and said I didn't feel well and could I have a T.O. They gave it to me." The journal had no entry in March 1986 or at any other time mentioning that her gun had been stolen.

In August 1985, appellant wrote Ruetten's mother, telling her she was "'truly in love with John'" and that the past year had "'really torn me up.'" The letter further stated: "'I wish it hadn't ended the way it did and I don't think I'll ever understand John's decision.'" In December 1985, appellant received a letter from Ruetten's mother that she said in her journal made her "'very, very, very sad.'"

Appellant was off duty on Monday February 24, 1986, the day Rasmussen was killed. She was also off duty the three preceding days. She returned to work on February 25. An officer who shared a locker room with appellant, Jayme

12

Weaver, did not recall observing any injuries on her on that day or on any other occasion.[23]

Appellant did not attempt to contact Ruetten after Rasmussen's death. Ruetten next saw appellant in 1989 when both were in Hawaii on vacation with other people. He saw her two or three times afterward and they had sexual relations, but they never became involved in a relationship. Appellant's home computers were analyzed by a computer expert who determined that she had performed searches of Ruetten's name in April 1998, May 1999 and December 1999.

Appellant was interviewed by LAPD Detectives Gregory Stearns and Dan Jaramillo on June 5, 2009. When asked about Ruetten, appellant repeated his name twice as if trying to recall who he was before saying "Oh yeah. I went to school with him." She first described him as a "close friend[]," and then said they dated while they were in college and "probably after college." She was evasive when asked how long they dated or when she spoke with him last, talking instead about his age, his family, when he graduated and when she met her husband. When asked what ended her relationship with Ruetten, she said she did not consider him her boyfriend and had gone out with others when they were dating. She denied their break up was unfriendly. When asked if she had ever met Rasmussen, she initially said, "God, I don't know" and "I may have." She initially claimed not to know what Rasmussen did for a living or where she worked, but later said "now that you're bringing it up, I think she worked at a hospital somewhere. And, yeah, I may have met her at a hospital. I may have talked to her once or twice." She later stated: "I may have gone to her and said, hey, you know

---

[23]    Michael Alexander, appellant's partner in 1986, was called by the defense and similarly testified that he did not recall seeing any injuries on her in February of that year.

what?  You know what?  Is he dating you?  He's . . . bothering me.  And so[,] I'm thinking that we had a conversation about that, one or two maybe."  She claimed to be uncertain of Rasmussen's first name and of how she learned of her death.

The detectives asked appellant multiple times if she knew where Ruetten and Rasmussen lived after their marriage and if she had ever been to their condominium or confronted Rasmussen there.  She initially claimed not to know where they lived and not to remember if she had ever been there.  She subsequently said she "may have known."[24]  When asked if she had ever gotten into a physical fight with Rasmussen, she said "[i]f it happened I honestly don't remember it.  That's all I can tell you" and "this is just not ringing a bell."  Toward the end of the interview, she said she was "shocked" that "somebody would be . . . saying that I did this.  I mean, we had a fight and so I went and killed her?  I mean, come on."

## 2. *Defense Evidence*

Sometime in the morning or early afternoon of February 24, 1986, Evangelina Flores, a cleaning lady working in a nearby condominium, heard loud sounds, like two people fighting, and a slamming sound, as if something had fallen.

---

[24]     At one point appellant said:  "I don't think I've ever gone there.  That's why I'm saying I don't . . . want to say, no, I've never gone there, and then you say, oh, I was at a party, cause I -- I -- I don't -- you know, I don't think so."  Asked specifically if she ever went to Rasmussen's house and had a dispute with her there, appellant said:  "You know, I'm must -- if I met her ever at his apartment, maybe.  I mean, maybe we could've met at -- I could've met at her apartment.  I'm thinking that the [¶] . . . [¶] hospital thing that sounds familiar that I -- I met her there.  I just can't say that I've ever  -- again, was it her with other people?  You know, I don't  -- I -- I -- I don't know. . . .  If somebody said I was there when they were there, then that's possible. . . [¶] . . . but I just -- I -- I don't recall, I mean, I don't think so.  I don't -- I -- it's not sounding familiar."

She then heard a car drive off. She told officers at the time that these sounds occurred at approximately 12:30 p.m.

Andrea Dillon, a fingerprint examiner, reviewed the latent fingerprints collected from the condominium after the homicide by LAPD criminalists. She found multiple identifiable fingerprints that could not be attributed to appellant, Ruetten or Rasmussen, including fingerprints on the stereo equipment stacked by the door to the garage.

Patricia Fant, a forensics firearms examiner, testified that Smith & Wesson had manufactured over 600,000 Model 49 revolvers. In addition, a company in Brazil manufactured a cheaper copycat version. Fant expressed the opinion that the recovered bullets could not be identified as having been made by a particular manufacturer or as being .38 Special Plus-P ammunition. She further opined that the barrel length of the gun could not be determined by measuring the distance between a hole in a blanket and the position of the barrel gap discharge because that distance would vary depending on how the blanket was folded.[25]

A Santa Monica Police Department records manager reviewed records and determined that on March 9, 1986, the day appellant reported the theft of her revolver from her car, there had been two other burglaries from automobiles in parking structures in the same area.

The defense introduced entries from appellant's journal, one from July 1986 in which she complained about not having her keys to get into her house and one from March 1986 that mentioned taking her car in for repair.

The defense called Suzanne Mendoza, who had known appellant virtually all her life, as a character witness. Mendoza had never observed appellant to be

---

[25] Fant also noticed faint shoe prints on the quilt for which the investigators had given no account.

15

violent toward anybody.  Michael Alexander who worked with appellant at the Devonshire Division in 1985 and 1986 and observed her interacting with many people, including arrestees, testified he did not consider her to be a violent person. Kim Dittbern, who attended an LAPD program with appellant for six months, never saw any violent behavior.  Sheri Huff, who had known appellant since their college days, had been friends with appellant when Ruetten dated one of Huff's roommates.  She had never observed appellant jealous or angry.  She had never seen appellant act violently.

C. *Verdict and Sentence*

The jury found appellant guilty of first degree murder, and found true that she had personally used a handgun.  The court imposed a sentence of 25-years to life for the murder and two years for the weapons enhancement.

**DISCUSSION**

A. *Pre-accusation Delay*

Appellant contends the trial court erred in denying her motion to dismiss the charges due to pre-accusation delay, in view of the time that passed between the crime and her arrest and trial, and the alleged negligence of the original investigators.  For the reasons discussed, we disagree.

1. *Background*

The information filed on December 18, 2009 accused appellant of committing murder on February 24, 1986, over 23 years earlier.  On October 20, 2009, appellant moved to dismiss on the ground that the delay in filing criminal charges prejudiced her ability to conduct her defense, and constituted a violation of her due process rights under the state and federal constitutions.  Appellant

16

contended that LAPD investigators were negligent or reckless in failing to investigate her possible involvement in the crime in 1986. She presented evidence that within days or weeks of Rasmussen's death, (1) Ruetten informed the investigators that appellant was his former girlfriend, (2) Rasmussen's father told the investigators that Rasmussen had been threatened by her husband's former girlfriend, and (3) Rasmussen's parents advised them to investigate appellant. Appellant also presented evidence that the investigators failed to promptly interview the woman who until June 1985 had been Rasmussen's roommate, and who knew that appellant had confronted Rasmussen at her workplace. Appellant submitted a declaration from Adalberto Luper, a former LAPD detective, who expressed the opinion that by ignoring leads provided to them by persons close to Rasmussen and focusing on the possibility that the crime had been committed by anonymous burglars with no connection to Rasmussen, the investigators "adopted a 'tunnel vision' approach to the investigation, rather than exploring the possibility that an LAPD officer was involved." According to Luper, this was "at least negligent."

With respect to prejudice arising from the delay, appellant asserted that her ability to prepare her defense had been compromised because: (1) the officers who saw or worked with appellant in the days after the homicide were unable to specifically recall whether appellant showed signs of having engaged in a physical struggle; (2) Rasmussen's secretary, who witnessed the confrontation between Rasmussen and appellant, had died; (3) documents supporting the chain of custody of certain items of physical evidence had been lost;[26] (4) the GSR (gun shot

---

[26] The items identified in the moving papers were the samples of red stains, a white dish towel, the white rope or cord found near the body, portions of fingernails, two hairs,

*(Fn. continued on next page.)*

17

residue) tests taken of Rasmussen's hands and the records of 911 calls about the crime had been destroyed; and (5) records indicating precisely when LAPD officers began using the type of ammunition the prosecution claimed had been used to shoot Rasmussen were no longer available.

Respondent contended that to prevail, appellant was required to prove not only that she was prejudiced by the pre-accusation delay but that the delay occurred as the result of deliberate action by the prosecution or LAPD investigators designed to gain a tactical advantage.[27] With respect to justification for the delay, respondent represented that the LAPD cold case unit requested DNA testing in September 2003, that the testing was accomplished in February 2005, and that periodic attempts to match the DNA (and fingerprints) from the crime scene to criminals whose profiles were stored in national data bases occurred thereafter. The case was assigned to a detective in February 2009. His investigation quickly focused on appellant, and in June 2009, one month after her DNA profile was surreptitiously obtained and matched to the bite mark swab, she was arrested.

Preliminarily, the court found that appellant had made a "minimal" showing of prejudice. The court was persuaded that due to the passage of time, appellant's former partners and the women who dressed with her in the locker room might have been unable to recall whether appellant had scratches or bruises on her body in the days after the killing, and that the absence of such marks could have been helpful to the defense. The court further found that the missing GSR evidence

and samples taken by the pathologist. There was no mention of the chain of custody for the bite mark swabs.

[27] At the hearing, defense counsel conceded the absence of evidence of intentional misconduct on the part of the investigators.

18

could have had "plausible value to the defense," and accepted the premise that the type of ammunition used by the LAPD in 1986 could have been more easily determined in the absence of the delay. The court did not, however, place much stock in the argument that "the police, if they'd acted quickly could have made a [ballistics] match on the gun" because appellant reported her gun missing within two weeks of the killing. Similarly, the court did not assign prejudicial value to the alleged gaps in the chain of custody of certain physical evidence -- which the court found likely to be "more prejudicial to the people" -- or the destruction of 911 tapes -- whose potential usefulness was "speculative."[28]

Having found that appellant had made a "showing of prejudice," albeit "fairly minimal," the court ruled that the truth-in-evidence provision of the California Constitution required application of the federal standard. In line with that reasoning, the court concluded that the lack of evidence that the delay was intentional or used to gain a tactical advantage precluded granting the motion. The court nevertheless went on to resolve the matter under the presumption that negligence was sufficient to support the motion to dismiss. The court concluded there was a "plausible argument to be made" that the investigating officers had been negligent, but stated that delay resulting from negligence required a greater showing of prejudice to "tip the scales" toward a finding of a due process violation than if the delay had been intentional. The court found strong justification for the delay in the necessity of developing the DNA evidence and matching it to appellant's DNA. Although "the police may have had some basis to suspect

[28] Respondent disputed that there were breaks in the chain of custody records for any evidence. Some specific items appellant claimed in her moving papers were missing or destroyed -- including, a bite mark exemplar taken of Rasmussen's teeth and the record of a polygraph examination of Ruetten -- were located and turned over to the defense prior to the trial court's ruling on the motion.

19

[appellant] shortly after the crime was committed," the case "was not solved until May of 2009 when [appellant's] D.N.A. was matched to the biological matter recovered from the crime scene." Once that occurred, "the authorities moved with appropriate dispatch and arrested [appellant]." The court concluded that "while the delay in bringing the charges against [appellant] has caused some possible prejudice to her ability to defend," the "strong justification for delay" compelled the conclusion that "there was absolutely no violation of her right to due process." Accordingly, the court denied the motion to dismiss.

2. *Analysis*

a. *Negligence on the part of investigators or prosecutors triggers application of the balancing test where the defendant establishes prejudice*

There is no dispute that "'[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.'" (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*), quoting *People v. Catlin* (2001) 26 Cal.4th 81, 107.) "'A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay.'" (*Nelson, supra,* 43 Cal.4th at p. 1250.) Once prejudice is demonstrated, the harm to the defendant "must be balanced against the justification for the delay" to determine whether a due process violation has occurred. (*Nelson*, *supra*, at p. 1251.)

In *Nelson*, our Supreme Court held that "negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process." (*Nelson, supra*, 43 Cal.4th at p. 1255.) The court observed that the United States Supreme Court had discussed the due process implications of investigative and prosecutorial delay on multiple occasions without ever having

20

been called on to decide whether negligent conduct might implicate a defendant's due process rights. (*Nelson*, *supra*, 43 Cal.4th at pp. 1251-1253.)[29] It concluded that because "the exact standard under [the United States] Constitution is not

---

[29]     *United States v. Marion* (1971) 404 U.S. 307, 324-325 and *United States v. Lovasco* (1977) 431 U.S. 783, 796-797 are often cited as establishing a federal standard of intentional delay. In *Marion*, the defendants presented no evidence of actual prejudice, but claimed dismissal was required because prejudice was "inherent" in the three-year delay between the occurrence of the criminal acts and the indictment. (404 U.S. at pp. 308, 325-326.) The United States Supreme Court found undisputed the proposition that "the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to [the accused's] rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." It added, however, that "we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution." (*Id.* at p. 324.) In *Lovasco*, where the defendant established neither deliberate conduct nor negligence on the part of the prosecution, the Court similarly stated that it "could not determine in the abstract the circumstances in which preaccusation delay would require dismissing prosecutions." (431 U.S. at pp. 795, 796-797.)

Respondent's reliance on two more recent United States Supreme Court decisions is misplaced. In *United States v. $8,850* (1983) 461 U.S. 555, the Court characterized *Lovasco* as requiring "a deliberate attempt to gain an unfair tactical advantage over the defendant" or "reckless disregard of [the delay's] probable prejudicial impact" in assessing due process challenges based on delay in instituting criminal prosecutions. (*Id.* at p. 563.) However, it did so for the purpose of summarizing the Government's position that the standard applicable to preaccusation delay provided the appropriate test for determining the consequences of governmental delay in filing a civil forfeiture proceeding -- a proposition the Court rejected. (*Ibid.*) In *United States v. Gouveia* (1984) 467 U.S. 180, the Court addressed the concern that government officials might intentionally delay prosecution of prisoners for crimes committed while incarcerated, by pointing out that *United States v. Lovasco* and *United States v. Marion* provided protection against use of deliberate delay as a device to gain an advantage against criminal defendants. (*Id.* at p. 192.) Neither case addressed whether negligently caused delay could lead to a violation of due process where the defendant was substantially prejudiced.

entirely settled[,] . . . we can and will apply California law." (43 Cal.4th at p. 1251.)

Our Supreme Court has repeatedly endorsed its holding in *Nelson*, reiterating in multiple recent cases that """"under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process,"""" and applying that standard to its analysis of the facts in the situation before it. (*People v. Jones* (2013) 57 Cal.4th 899, 920-921; accord, *People v. Abel* (2012) 53 Cal.4th 891, 909; *People v. Cowan* (2010) 50 Cal.4th 401, 431.)

Respondent contends the holding in *Nelson* is no longer binding because the crime in *Nelson* took place in 1976, prior to the passage of Proposition 8, adding the truth-in-evidence provision to the California Constitution (Cal. Const., art. I, § 28, subd. (f)(2) [formerly subd. (d)]). Respondent asserts that the provision requires application of federal standards to motions to dismiss for prejudicial delay.[30] Respondent overlooks Supreme Court decisions applying the *Nelson* standard where the crimes post-dated Proposition 8's passage. (*People v. Jones*, *supra*, 57 Cal.4th at pp. 920-921 [crime occurred in 1985]; *People v. Abel*, *supra*, 53 Cal.4th at p. 909 [crime occurred in 1991]; *People v. Cowan*, *supra*, 50 Cal.4th at p. 431 [crime occurred in 1984].) Respondent urges us to disregard this binding authority and instead follow the reasoning of *People v. Valencia* (1990) 218

---

[30] The truth-in-evidence provision, added to our state Constitution in 1982, provides that "[e]xcept as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . ." (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 59.) It is interpreted as precluding exclusion of unlawfully obtained evidence unless mandated by the United States Constitution. (*Ibid*; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 365 (*People v. Bryant*); *People v. Banks* (1993) 6 Cal.4th 926, 934; *In re Lance W.* (1985) 37 Cal.3d 873, 888.)

22

Cal.App.3d 808. There, the motion to dismiss was based on the deportation of a witness who allegedly could have provided exculpatory evidence; the Court of Appeal held that the truth-in-evidence provision of the California Constitution required application of the federal standard of materiality. (*Valencia*, *supra*, 218 Cal.App.3d at pp. 813-814, 825.) In reaching its conclusion, the court found that the provision applies not only where the defendant requests exclusion of evidence as a remedy, but also where the defendant seeks dismissal of all charges "[s]ince dismissal amounts to the exclusion of all the evidence . . . ." (*Id.* at p. 819.)

As our Supreme Court has since observed, however, the language of the truth-in-evidence provision "broadly eliminates rules that *exclude relevant evidence* from a criminal trial"; its words "do not speak beyond that subject." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1178, italics added and omitted; see *People v. Cahill* (1993) 5 Cal.4th 478, 500 ["By its terms, the Truth-in-Evidence provision affects only the *admissibility* of evidence."]; *People v. Macias* (1997) 16 Cal.4th 739, 749 [The provision "was intended to eliminate judicial precedents interpreting the state Constitution to exclude otherwise admissible evidence."].) Accordingly, we are doubtful that the truth-in-evidence provision applies where the requested remedy is not suppression of evidence, but dismissal of all charges based on the state's violation of a defendant's due process rights.

More important, even were we persuaded that the provision applies to the dismissal of all charges, we would reject respondent's argument that it compels a different standard for reviewing a claim of pre-accusation delay than the one articulated by our Supreme Court in *Nelson*. As the court found, the standard to be applied where unjustified delay has prejudiced the defense under the United States Constitution is not settled. (*Nelson*, *supra*, 43 Cal.4th at p. 1251; see *U.S. v. Gross* (E.D.N.Y. 2001) 165 F.Supp.2d 372, 378-379 [observing that "[t]he Fourth, Seventh, and Ninth Circuits have dismissed indictments based on a standard other

23

than governmental intent to achieve a tactical advantage"].)  The issue whether the United States Supreme Court has articulated a federal standard to supplant *Nelson* was recently addressed in *People v. Boysen* (2007) 165 Cal.App.4th 761.  There, the court explained:  "Even if [the truth-in-evidence provision] applies to the dismissal of prosecutions for preaccusation delay, there is no controlling federal authority limiting such dismissal to situations in which the delay was deliberate and designed to disadvantage defendants; and there is no requirement, therefore, that we limit dismissal to those cases in which delay was undertaken to disadvantage the defendant.  Since there is no controlling federal law on the subject, the courts of this state are free to independently interpret the United States Constitution.  [Citation.]  Our state Supreme Court and our Courts of Appeal have done so, and have chosen to apply the balancing test [balancing actual prejudice against the justification for delay]."  (*Id*. at pp. 771, 776.)

The weight of authority establishes that the trial court erred in its initial ruling that negligence alone could not support a motion to dismiss due to delay.  However, its error did not affect the outcome.  The court went on to analyze the justification for the delay and whether the justification outweighed the prejudice to appellant, concluding that it did.  We, therefore, turn to this issue.

> b. *The trial court did not abuse its discretion in concluding that the justification for the delay outweighed any prejudice to the defense*

A defendant seeking dismissal of a charge on the ground of unjustifiable delay "'must demonstrate prejudice arising from the delay.'"  (*Nelson*, *supra*, 43 Cal.4th at p. 1250, quoting *People v. Catlin, supra,* 26 Cal.4th at p. 107.)  "'[P]rejudice may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay.'"

24

(*People v. Catlin*, *supra*, 26 Cal.4th at p. 107.)  The prosecution must then "'offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.'"  (*Nelson*, *supra*, at p. 1250, quoting *People v. Catlin*, *supra*, at p. 107.)  In determining whether the delay resulted in a violation of due process, the trial court engages in "'a delicate judgment' [citation], by balancing the public interest in favor of the prosecution against the rights of the defendant."  (*Penney v. Superior Court* (1972) 28 Cal.App.3d 941, 954.)  "[T]he particular circumstances surrounding the decision not to prosecute, the length of the delay, and the reasons for the subsequent re-evaluation and prosecution must all be considered."  (*Id*. at p. 954.)  "[W]hether the delay was negligent or purposeful is relevant to the balancing process.  Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation.  If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation,"  (*Nelson*, *supra*, 43 Cal.4th at p. 1256.)

"We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]."  (*People v. Cowan*, *supra*, 50 Cal.4th at p. 431.)  In evaluating the correctness of a trial court's denial of a defendant's speedy trial motion, "we consider all evidence that was before the court at the time the trial court ruled on the motion.  [Citation.]"  (*People v. Jones, supra,* 57 Cal.4th at p. 922.)

In the weighing process, "the seriousness of the crime for which the indictment is returned must be given appropriate consideration.  The fact that the Legislature has decreed no statute of limitations for murder shows the importance that society places on governmental efforts to bring a murderer to the bar of

justice." (*Penney v. Superior Court, supra,* 28 Cal.App.3d at p. 954.) "[T]he delay may be unreasonable if the prosecution delayed in filing charges when all the evidence was discovered years earlier" (*People v. Harman* (1985) 170 Cal.App.3d 572, 581), or where "the reason for the delay was not investigative needs but the lack of interest of the responsible agencies in prosecuting the defendants on the basis of [the] evidence." (*People v. Pellegrino* (1978) 86 Cal.App.3d 776, 781.) On the other hand, "[i]t requires no extended argument to establish that prosecutors do not deviate from 'fundamental conceptions of justice' when they defer seeking indictments until they have probable cause to believe an accused is guilty . . . ." (*United States v. Lovasco*, *supra*, 431 U.S. at pp. 790-791.) "The determination of when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions." (*Id*. at p. 793.)

In *Nelson*, the defendant had been interviewed as a suspect in a 1976 murder, but was not charged until 2002, following DNA testing of semen stains found on the victim. (*Nelson*, *supra*, 43 Cal.4th at pp. 1248-1249.) Rejecting the defendant's claim that the 26-year delay in bringing charges violated his constitutional rights to a fair trial and due process, the court observed: "The police may have had some basis to suspect defendant of the crime shortly after it was committed in 1976. But law enforcement agencies did not fully solve this case until 2002, when a comparison of defendant's DNA with the crime scene evidence resulted in a match, i.e., until the cold hit showed that the evidence came from defendant. Only at that point did the prosecution believe it had sufficient evidence to charge defendant." (*Id*. at p. 1256.) The court emphasized that "'[p]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. . . .'" (*Ibid*., quoting *People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899,

914-915; see also *People v. Spicer* (2015) 235 Cal.App.4th 1359, 1377-1378 [prosecution "first possesses 'facts necessary to sustain [a] charge' when it secures evidence supporting the objectively reasonable belief that it '"will be able to promptly establish guilt beyond a reasonable doubt,"'" not when it has "substantial evidence of guilt" or "reasonable suspicion that [the defendant] committed the crime"].)

Appellant does not suggest the prosecution had sufficient evidence to warrant charging her before the DNA match in 2009, but contends that "DNA technology available since the 1980's could readily have been used to evaluate appellant as a suspect." This same argument was rejected by the Supreme Court in *Nelson*. Responding to the defense claim that law enforcement agencies were negligent in failing to test the samples earlier for a DNA match, the court observed: "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. . . . [T]he difficulty in allocating scarce prosecutorial resources . . . [is] a valid justification for delay.' [Citation.] It is not enough for defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson*, *supra*, at pp. 1256-1257, quoting *People v. Dunn-Gonzalez*, *supra*, at p. 915.) It is clear from the record below that testing tissue samples to obtain a DNA profile is a difficult and time-consuming process. It is equally clear that there were many cold cases potentially resolvable through DNA analysis in the pipeline. Appellant has not demonstrated that law enforcement was negligent in failing to test the evidence in this case earlier.[31]

---

[31] Additionally we note that appellant's claim that DNA testing available in the 1980's could "readily have been used to evaluate appellant" is incorrect. "The first use of

*(Fn. continued on next page.)*

27

Against the justification for the delay must be balanced the minimal prejudice identified by appellant. She claims witnesses would have been able to testify with greater certainty that she showed no sign of injury in the days following the murder. This would have been of marginal significance. The record was undisputed that no one observed appellant to have been injured in the days after the murder, and it was entirely possible that Rasmussen's attacker suffered no visible injury, as Rasmussen was struck with a gun and another heavy object before being killed and had very little foreign tissue under her fingernails. Moreover, the areas of appellant's body her partner and coworker could have seen were limited.

Appellant claims she could have produced her gun and established that it was not the murder weapon. But according to appellant, her gun was stolen within two weeks of the killing. The investigation could not reasonably have been concluded within that period of time.

Appellant claims a loss of evidence "to impeach" the chain of custody for the biological evidence, but identifies no such potential evidence. As the trial court observed, the passage of time was more likely prejudicial to the prosecution than

---

nuclear DNA evidence (i.e., analysis of DNA patterns in the nuclei of cells) for forensic identification purposes took place in a 1988 Florida case," two years after the Rasmussen homicide. (Chin et al., Forensic DNA Evidence: Science and the Law (Updated April 2015) § 2:1, 1st par., citing *Andrews v. State* (Fla. 1988) 533 So.2d 841.) Moreover, "[e]arly cases involved a DNA typing process known as RFLP, or Restriction Fragment-Length Polymorphism. [Citation.] While highly discriminating as an identifier, RFLP testing requires a sample size much larger than what is now suitable for STR (Short Tandem Repeat) test results . . . ." (*Ibid*.) The first reference to STR analysis, the type performed here, was in 1997, more than a decade after Rasmussen's murder. (See *Commonwealth v. Rosier* (1997) 425 Mass. 807 [685 N.E.2d 739]; see also *People v. Allen* (1999) 72 Cal.App.4th 1093, 1099-1100 [acknowledging the absence of "published California decisions discussing STR"].)

the defense in demonstrating an adequate chain of custody, and appellant does not assign error to any trial court ruling based on chain of custody.

Appellant claims the loss of 911 and "police communication" tapes prejudiced her ability to show that there were other suspects. We agree with the trial court that the possibility of any exonerating evidence on such tapes was speculative in the extreme. The body was not discovered for many hours, when Ruetten returned home in the evening and called 911. He had no information about how Rasmussen died or who killed her, and could have said nothing to support the existence of other suspects. After the police arrived in response to Ruetten's call, Volanitis and Flores were interviewed and gave written statements that were made available to the defense. There was no indication that either called 911, and no suggestion that anyone else in the area noticed anything amiss at the time of the murder.

Finally, appellant claims that the delay interfered with her ability to identify alternate suspects whose presence was allegedly demonstrated by the unidentified fingerprints and DNA found at the scene and in the BMW. Such evidence -- found in locations and quantities consistent with casual contact -- did not suggest the presence of another assailant. Moreover, the databases of criminals whose fingerprint and DNA samples were available for computer matching had only increased in the intervening years. In view of the minimal prejudice and the lack of indication that any significant evidence had been lost, the trial court did not abuse its discretion in denying the motion to dismiss.

29

B. *Motion to Quash*

  1. *Background*

Two warrants were issued authorizing searches of appellant's property.[32] The first permitted authorities to search appellant's residence and several vehicles registered to her. It sought electronically and digitally stored material, documents, and records related to the homicide, Rasmussen or Ruetten, including "letters, diaries, journals, writings, newspaper articles, books, correspondence, [or] greeting cards"; photographs of Ruetten and Rasmussen; items that may have belonged to Ruetten or Rasmussen; information identifying persons "who may have associated with or [may] have known" Ruetten, Rasmussen or appellant; medical or dental records tending to establish whether appellant received treatment for injuries after February 24, 1986; "bills, receipts, papers, reports or forms" from 1986 generally; and all .38/.357 caliber firearms in appellant's possession. The second warrant, issued by a different magistrate, gave permission to search the "computers, storage media, computer hardware and digital evidence" seized pursuant to the first warrant, including "[email], internet browsing histories, cached information, partially deleted files, records, receipts, screen captures, photographs, logs, [and] printouts."

The first warrant was issued pursuant to a 26-page affidavit and statement of probable cause executed by Detective G. Stearns, a 14-year veteran of the LAPD who had been involved in approximately 150 homicide investigations, 40 as the lead investigator. Detective Stearns related in detail the facts surrounding the

---

[32] A third search warrant seeking the contents of appellant's cellular phone is not at issue here.

30

homicide and the 1986 investigation.[33]  Detective Stearns also related the facts surrounding DNA testing of the bite mark swab and other tissue samples from the crime scene by LAPD criminalist Francis, and the collection and testing of appellant's discarded straw and cup for DNA comparison purposes.  He stated that in 2009, Detective Nuttal was assigned to the matter and re-interviewed Ruetten.  Ruetten told the detective about his relationship with appellant and appellant's emotional reaction to learning of Ruetten's engagement to Rasmussen.  The affidavit described appellant as "express[ing] to [Ruetten] that she wished to pursue a committed relationship with him" at their June 1985 meeting.  Detective Nuttal discovered that the day of the murder was a day off for appellant.  The affidavit also described two meetings between appellant and Rasmussen.  In the first, at Rasmussen's workplace, appellant had allegedly told Rasmussen about getting together with Ruetten after he had begun dating Rasmussen and said, "'If I can't have John, you can't either.'"  On the second occasion, reported to Detective Nuttal by Rasmussen's father, Rasmussen "found [appellant], in full police uniform, standing in the living room area" of her condominium, and had no idea how appellant had gotten in.  There was a verbal altercation between them that left Rasmussen fearful.  Rasmussen also allegedly told her Father two weeks before her death that she had arranged to meet someone to resolve "'a serious problem'" she did not want to discuss with her husband.

Detective Stearns stated in his original affidavit that based on the information currently available in the investigation and specifically, the evidence

---

[33]    These details involved the injuries to the body, the evidence found at the crime scene, and the statements of the witnesses in 1986.  The discussion in Detective Stearns's affidavits with respect to these matters was not significantly different from the evidence adduced at trial, and we do not repeat it here.

that appellant's relationship with Ruetten "was significant to her and that she was extremely upset and devastated when Ruetten became engaged to and ultimately married Rasmussen," and the fact that the gun appellant had reported stolen on March 19, 1986 had never been recovered, it was reasonable to believe that appellant "may still be in possession of diaries, daily journals or other writings expressing her feelings towards Ruetten and Rasmussen at the time leading up to and after the murder," as well as the weapon used to commit the homicide, and that "the locations to be searched may contain photographs, names, addresses and/or information that will identify current and former co-workers, friends or associates who may have knowledge of [appellant's] activities and appearance from the period when the murder occurred or other material information relevant to this investigation."

Detective Stearns also submitted a brief affidavit in support of the second warrant. He described the seizing of the electronic items pursuant to the first warrant and stated the items "may contain images, files, documents or other data related to this investigation" or information concerning "persons who might be material witnesses in this case or have other information relevant to the ongoing investigation."

The searches of appellant's home and computers that followed issuance of the two warrants led to the discovery of evidence introduced at trial, including appellant's journal and planner, photographs appellant had kept of Ruetten, and evidence that appellant had conducted several on-line searches for information about Ruetten over the years.

Prior to trial, appellant moved to quash the warrants and suppress the evidence obtained during the searches. Focusing on the original affidavit, she contended Detective Stearns had expressed unsupported opinions in it and that the information it contained was stale. She further contended both warrants were

overbroad. She asserted that the "good-faith" exception set forth in *United States v. Leon* (1984) 468 U.S. 897 (*Leon*) was inapplicable because Detective Stearns could have had no "objectively reasonable" belief in the warrants' validity. Respondent opposed, contending the relationship between appellant, the victim and Ruetten, coupled with the nature of the crime, provided support for the issuance of the warrants, that the items sought were likely to have been retained by appellant, that the warrants were not overbroad, and that, in any event, the good faith exception applied.

The court denied the motion to quash. At the hearing, the court stated that the "main reason" for the denial was the evidence of the detective's good faith. The court found nothing to suggest that Detective Stearns had tried to mislead either magistrate. The court agreed there was a plausible argument for overbreadth in the requests to search for "bills, receipts, paper or reports or forms from 1986" and for the names of all "people who may have associated with" Rasmussen, Ruetten or appellant. The court was "uncomfortable" with the request to search appellant's computers because they were unlikely to have been in existence at the time of the crime. However, the court concluded that warrants should not be read in a hypertechnical way and that it was up to the issuing magistrates to tell the detective to "'tighten [the] language'" or "beef it up." With respect to staleness, the court stated that in light of its finding of good faith, it had no reason to reach any issue pertaining to probable cause. The court observed, however, that the detective had clearly laid out in the affidavit that he was looking for evidence of the relationship that was "the motivating factor for the killing," and that it was "reasonable to conclude that there would be [such] evidence" in appellant's home, given "the nature of the items sought," and the fact that "the interest in maintaining the relationship was so strong that . . . it [allegedly] drove the suspect to commit the murder or the killing in the first place."

33

2. *Analysis*

a. *The issuance of the warrants was supported by probable cause*

The Fourth Amendment to the United States Constitution prohibits "'unreasonable searches and seizures'" and requires search warrants to be issued only upon a showing of "probable cause" describing with particularity "the place to be searched and the . . . things to be seized." United States Supreme Court decisions establish an exclusionary rule that, when applicable, forbids the use of evidence obtained in violation of the Fourth Amendment at trial. (*Herring v. United States* (2009) 555 U.S. 135, 139.)[34] "'Probable cause sufficient for issuance of a warrant requires a showing that makes it "'substantially probable that there is specific property lawfully subject to seizure presently located the particular place for which the warrant is sought.'" [Citation.] That showing must appear in the affidavit offered in support of the warrant. [Citation.]'" (*People v. Bryant*, *supra*, 60 Cal.4th at pp. 369-370, quoting *People v. Carrington* (2009) 47 Cal.4th 145, 161.) Probable cause may be shown by evidence that would not be competent at trial, including "'information and belief.'" (*People v. Varghese* (2008) 162 Cal.App.4th 1084, 1103, quoting *Humphrey v. Appellate Division* (2002) 29 Cal.4th 569, 573.)

The magistrate issuing the warrant "is entitled to rely upon the conclusions of experienced law enforcement officers in weighing the evidence supporting a request for a search warrant as to where evidence of crime is likely to be found.

---

[34] As noted, the truth-in-evidence provision of the California Constitution requires California courts to apply federal constitutional law to motions to suppress evidence obtained as the result of unreasonable searches and seizures. (Cal.Const., art. I, § 28, subd. (f)(2); *People v. Maikhio* (2011) 51 Cal.4th 1074, 1089.)

34

[Citation.] It is not essential that there be direct evidence that such evidence will be at a particular location. Rather, the magistrate "'is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.'" [Citation.]" (*People v. Sandlin* (1991) 230 Cal.App.3d 1310, 1315, quoting *United States v. Fannin* (9th Cir. 1987) 817 F.2d 1379, 1381-1382.)

"In reviewing a trial court's denial of a motion to suppress evidence obtained pursuant to a warrant, '[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment [citations],'" giving "great deference to the magistrate's determination of probable cause." (*People v. HuIland* (2003) 110 Cal.App.4th 1646, 1651, quoting *People v. Glaser* (1995) 11 Cal.4th 354, 362.) "In cases where the facts are essentially undisputed, we independently determine the constitutionality of the challenged search or seizure." (*People v. Rangel* (2012) 206 Cal.App.4th 1310, 1315.) "[B]ecause '[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause,'" . . . "'doubtful or marginal'" cases are to be resolved with a preference for upholding a search under a warrant." (*People v. French* (2011) 201 Cal.App.4th 1307, 1315, quoting *Leon*, *supra*, 468 U.S. at p. 914.)

Appellant contends that because the crime occurred more than 20 years before the issuance of the warrants, the information used to support them was necessarily stale. Appellant further contends the fact that she moved residences during those years precluded a finding of any nexus between items related to the crime and her current home. Finally, she contends the search of her computers was improper because the affidavit provided no substantial evidence to support that they existed at the time of the crime or that appellant kept evidence of the crime on

35

them.  In the exercise of our independent judgment, we conclude that the information in the affidavit provided probable cause to search appellant's current home and computers despite the passage of years.

There is no "bright-line rule defin[ing] the point at which information is considered stale." (*People v. Carrington*, *supra*, 47 Cal.4th at p. 163.)  "Rather, 'the question of staleness depends on the facts of each case.' [Citation.]" (*Id*. at p. 163.)  The question turns on whether "facts supporting the warrant application establish it is substantially probable the evidence sought will still be at the location at the time of the search." (*People v. Bryant*, *supra*, 60 Cal.4th at p. 370, italics deleted.)  "Substantial delays do not render warrants stale where the defendant is not likely to dispose of the items police seek to seize." (*People v. Stipo* (2011) 195 Cal.App.4th 664, 672; see *U.S. v. McCall* (4th Cir. 1984) 740 F.2d 1331, 1336 ["'The vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit.'"].)  Courts have recognized that firearms are likely to be retained by a suspect long after the crime is committed.  (See, e.g., *People v. Bryant*, *supra*, at p. 369; *U.S. v. Singer* (7th Cir. 1991) 943 F.2d 758, 763; *United States v. Maxim* (8th Cir. 1995) 55 F.3d 394, 397 [recognizing that firearms enthusiasts could be expected to hold onto weapons for 10 or 20 years].)  "[F]irearms, unlike drugs, are durable goods useful to their owners for long periods of time." (*U.S. v. Singer*, *supra*, at p. 763.)  Courts also recognize the longevity of information stored on computers.  (See, e.g., *U.S. v. Lemon* (8th Cir. 2010) 590 F.3d 612, 615-616; *U.S. v. Newsom* (7th Cir. 2005) 402 F.3d 780, 783; see *U.S. v. Johnson* (D. Md. 2012) 865 F.Supp.2d 702, 707 [because evidence on a computer is recoverable months or years after it has been downloaded, deleted, or viewed "the age of the information supporting a warrant is increasingly irrelevant when the object searched is stored on a computer"].)

Here, the affidavit presented strong evidence of appellant's guilt and she does not argue otherwise. The affidavit also presented evidence of appellant's apparent motive: her romantic obsession with the victim's husband. Given the evidence that her obsession was powerful enough to lead her to commit murder, it was probable that she would have continued to retain items evidencing her relationship with Ruetten and her feelings toward Ruetten and Rasmussen, even after all the years that had passed. Moreover, although she claimed her Smith & Wesson Model 49 revolver, the probable murder weapon, had been stolen, the magistrate could reasonably conclude that she had instead hidden it and kept it near her. (See *People v. Carrington*, *supra*, 47 Cal.4th at p. 163 [magistrate could reasonably conclude that suspect's residence was logical place to look for specific incriminating items]; *U.S. v. Steeves* (8th Cir. 1975) 525 F.2d 33, 38 [people who own guns generally keep them at home or on their persons].) With respect to her contention that her move from one residence to another precluded a finding of a nexus between her current home and the evidence sought, the warrants specifically sought photographs, journals and diaries. A person does not normally discard such items, even after several moves. (See *U.S. v. Freeman* (5th Cir. 1982) 685 F.2d 942, 949 [nexus between house to be searched and evidence sought may be established either through direct observation or through normal inferences as to where articles sought would be located]; *U.S. v. Domingo* (M.D. Fla. 2010) 2010 U.S. Dist. LEXIS 124145, at *19-22 [reasonable to infer that defendant would move valued materials to his new residence].)

Appellant claims that the warrant was overbroad in granting permission to search her computers, as there was no evidence she owned any of them at the time of the homicide. The fact that she may not have owned those computers at the time of the crime did not preclude the possibility that she had transferred information or records -- particularly photographs -- to computers owned at the

37

time of the search.  (Cf. *Arkansas Chronicle v. Easley* (E.D. Va. 2004) 321 F.Supp.2d 776, 795 [recognizing that photographs and video preserved in computer format are "easily transferrable"]; *U.S. v. Christie* (10th Cir. 2013) 717 F.3d 1156, 1164 [observing that personal computers often hold "diaries, calendars, files, and correspondence"].)  Moreover, had she made new journal entries about Ruetten or Rasmussen years after the homicide, that would have been highly pertinent to motive.  Finally, any evidence that in the ensuing years she had conducted computer searches for information about Ruetten or the homicide would have further evidenced her strong feelings for him during the relevant period.  (See *People v. Varghese, supra,* 162 Cal.App.4th at p. 1106 [fact that defendant researched romantic rival on his computer was evidence of jealousy and supported that rival's murder was "crime of passion"].)  In short, probable cause supported the issuance of the warrants despite the time that had passed since the crime.  Moreover, as discussed below, even were we to find otherwise, the good faith exception would have precluded application of the exclusionary rule.

b. *The good faith exception precluded suppression of evidence obtained in the searches.*

In *Leon*, the Supreme Court held that when "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," the "marginal or nonexistent benefits" produced by suppressing the evidence obtained "cannot justify the substantial costs of exclusion."  (*Leon*, *supra*, 468 U.S. at pp. 920-922.)  "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates."  (*Id*. at p. 916.)  Therefore, suppression of evidence is an appropriate remedy only if "the magistrate or judge in issuing [the] warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for

38

his reckless disregard of the truth," the affidavit is "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" or the affidavit is so deficient in particularizing the place to be searched or the things to be seized that the executing officer "cannot reasonably presume it to be valid." (*Leon*, *supra*, at p. 923.) In considering the issue, we apply the objective test of "'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" (*People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1015, quoting *Leon*, *supra*, 468 U.S. at p. 923, fn. 23.) We review the trial court's application of the good faith exception de novo. (See *United States v. Crews* (9th Cir. 2007) 502 F.3d 1130, 1135.)

Here, there is no question that the searches of appellant's home, automobiles, and computers took place after the issuance of duly authorized warrants. We perceive no misrepresentations in the supporting affidavits. Appellant contends the detectives involved in the searches should have been aware that the supporting affidavits were lacking in any indicia of probable cause due to the staleness of the information. As discussed, the concept of staleness depends on the facts of the crime and the nature of the items or information sought. The evidence known to Detective Stearns established that there was a strong possibility appellant had killed Rasmussen and that she had done so as the result of jealousy and romantic obsession. According to information known to him and set forth in his affidavit, her strong feelings led her to an emotional outburst in front of Ruetten and to two prior hostile confrontations with Rasmussen. Given the intensity of her feelings demonstrated by her conduct, there was a reasonable likelihood that she would have documents or information relevant to her feelings toward Ruetten or the killing of Rasmussen in her home or on her computers. Even were we to conclude otherwise, we perceive no basis for the detectives involved to have

39

concluded there was no reasonable basis to support probable cause. Accordingly, we find no error in the trial court's decision to deny the motion to suppress.[35]

C. *Motion to Traverse*

1. *Background*

Prior to trial, appellant moved to traverse the warrants, seeking a hearing pursuant to *Franks v. Delaware* (1978) 438 U.S. 154, in which defense counsel could cross-examine Detective Stearns. Appellant contended Detective Stearns misrepresented the nature of the communication between appellant and Ruetten after she learned of his engagement, and that the detective omitted material facts, including that appellant never initiated contact with Ruetten after the homicide, that she started dating her present husband in 1992, that she had been married for 13 years and had a young child, and that she had not moved into the residence that was the subject of the initial warrant until May 1994. Respondent opposed, contending appellant had failed to make the necessary showing of material falsehood. The trial court denied the motion, finding no significance to the alleged misrepresentations and no likelihood that had the omitted facts been included, the issuing magistrates would have denied the warrant applications.

2. *Analysis*

In *Franks v. Delaware*, the Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in

---

[35] Because we find that the search warrants were properly issued and that, in any event, the officer's reliance on them was justified under *Leon*, we need not address respondent's argument that any error in denying the motion to suppress was harmless.

40

the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." (*Franks v. Delaware*, *supra*, 438 U.S. at pp. 155-156.) Our Supreme Court has said that "'[a] defendant who challenges a search warrant based upon an affidavit containing omissions bears the burden of showing that the omissions were material to the determination of probable cause.'" (*People v. Panah* (2005) 35 Cal.4th 395, 456, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1297.) Facts omitted from a search warrant affidavit are "not material" if "there is no 'substantial possibility they would have altered a reasonable magistrate's probable cause determination,' and their omission did not 'make the affidavits *substantially misleading*.'" (*People v. Eubanks* (2011) 53 Cal.4th 110, 136.) We review de novo a trial court's decision denying a *Franks* evidentiary hearing into the affiant's state of mind. (*People v. Panah*, *supra*, 35 Cal.4th at p. 457.)

Here, the trial court found no material misrepresentations in either affidavit. It further found that the information omitted was immaterial and would not have led to a different decision on the part of the issuing magistrates. We agree. That appellant married years after the homicide had no bearing on whether she would likely have retained items relevant to the case, as discussed above. Moreover, we find no merit to appellant's contention that Detective Stearns misled the issuing magistrates by either affirmative falsehoods or omissions. Although Detective Stearns's original affidavit did not state that appellant did not initiate contact with

41

Ruetten after their June 1985 meeting, it did not reference any later meetings and did not create the impression that appellant pursued Ruetten after the homicide. And while the affidavit did not state that appellant had changed residences, neither did it suggest that the residence to be searched was appellant's residence in 1986. In short, nothing contained in or omitted from Detective Stearns's affidavits rendered them "'substantially misleading.'" (*People v. Eubanks*, *supra*, 53 Cal.4th at p. 136, italics deleted.) Accordingly, there was no basis for a *Franks* hearing, and the trial court did not err in refusing to hold one.

D.  *Admissibility of Appellant's Interview*

1.  *Background*

Appellant was interviewed by two detectives on June 5, 2009, while still employed by the LAPD. She was persuaded to enter the interview area by a ruse: the detectives told her they needed her expertise in an art theft investigation. Once inside the interview room, the detectives admitted wanting to question appellant about "a case [they were] working on" involving Ruetten and his wife. They said they had gotten appellant away from her desk in order to protect her privacy and prevent her coworkers from overhearing the questions and answers. They later said they "got this [case] the other day" and that the chief was "pushing some older cases out even to the guys . . . [¶] . . . that work active cases." Appellant stated she vaguely recalled speaking to someone during the original investigation. The detectives did not tell appellant she was in custody. She was not advised of her *Miranda* rights prior to the interview.[36] During the interview, she was told she was not under arrest, that she could walk out whenever she felt like it, and that she was

---

[36]    *Miranda v. Arizona* (1966) 384 U.S. 436.

"free to go." Appellant herself referred to the possibility that she would recall more information pertinent to the investigation "as soon as I walk out of here." Near the end of the interview, appellant stated that she knew "how this stuff works," and asked if the detectives viewed her as a "suspect," if the interview was "an interrogation," and if they were "trying to pin something on [her]." Asked if she would provide a DNA sample, she said "[m]aybe," and that she needed to talk to a lawyer. Appellant was allowed to walk out of the interview room, but thereafter was arrested and advised of her *Miranda* rights. She declined to speak further.

Prior to trial, the prosecution moved to admit a recording of appellant's interview. The moving papers asserted that appellant was not in custody at the time of the questioning and therefore *Miranda* warnings were not required. The prosecution further contended that the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq., POBRA) did not apply, because the investigation was concerned solely and directly with criminal activities.[37]

Appellant did not dispute that she was not in custody for purposes of *Miranda*. She contended, however, that the statements were inadmissible under

_____

[37]    POBRA applies generally where the "public safety officer is under investigation and subjected to interrogation by his or her commanding officer, or any other member of the employing public safety department, that could lead to punitive action" and provides: "If prior to or during the interrogation of a public safety officer it is deemed that he or she may be charged with a criminal offense, he or she shall be immediately informed of his or her constitutional rights." (Gov. Code, § 3303, subd. (h).) However, section 3303, subdivision (i) specifically states: "This section shall not apply to . . . an investigation concerned solely and directly with alleged criminal activities." (See also § 3303 ["[P]unitive action means any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment."].)

43

*Garrity v. New Jersey* (1967) 385 U.S. 493 (*Garrity*).[38] Appellant submitted a declaration in which she stated: "I was aware [during the interview] that if I did not answer their question, I could be subject to discipline by the [LAPD]. [¶] . . . This discipline would consist of a wide range of possible penalties, including suspension or termination of employment."[39] Appellant also presented evidence that in January 2010, LAPD's internal affairs group recommended terminating her based on the following allegations: (1) "beginning [on] June 5, 2009[,] to the present, [appellant] has not reported for duty to her position at Commercial Crimes Division, as required"; (2) "on or about June 5, 2009, [appellant] became the subject of a criminal investigation, which resulted in her arrest for the murder of S. Rasmussen."

In its reply, the prosecution submitted the declaration of Mark Perez, an LAPD Deputy Chief. He stated that when an officer is internally or administratively investigated, a complaint form is prepared, the officer is notified in advance of any interrogation, and he or she is given an opportunity to be represented. If the officer does not wish to give a voluntary statement during an administrative interrogation, he or she is "explicitly ordered, on pain of administrative discipline up to and including termination, to . . . answer questions." Such instruction is "always explicit and verbal, and the officer being interrogated is directed to sign a form indicating that [the officer is] the subject of an administrative investigation and that [the officer is] providing a statement under

---

[38] In *Garrity*, discussed further below, the Supreme Court held that the statements of police officers made under threat of removal from office were coerced and could not be used in subsequent criminal proceedings. (*Garrity, supra*, 385 U.S. at p. 500.)

[39] Respondent contends on appeal for the first time that the declaration was inadmissible hearsay. Respondent forfeited that objection by failing to raise it in a more timely manner.

duress, for administrative purposes only." Deputy Chief Perez stated that appellant was never subjected to administrative interrogation. Also attached to the reply was documentary evidence that appellant herself had acted as an internal affairs investigator, and thus had knowledge of the procedures employed when an officer was under internal investigation and subject to discipline.

At the hearing, counsel for respondent further explained: "[I]n every case [in which the LAPD seeks to compel a statement from an officer] . . . they ask, [']are you going to give a voluntary statement?[']" If the officer exercises his or her Fifth Amendment privilege, the response is: "[']Very well, we are going to order you now to make a statement and now your privilege is protected because it's supplanted by the use immunity.[']" In other situations "before a grand jury, . . . in a civil matter, in a criminal matter," the police officer retains his or her Fifth Amendment rights. Accordingly, "[the privilege] existed in that interview room when [appellant] was being interviewed by [the] detectives."

The court ruled the interview tape admissible. At the hearing, the court explained that because the detectives conducting the interview were from a different unit, were not in appellant's supervisory chain of command, and approached her using a ruse, they were clearly conducting a criminal investigation. Although appellant stated in her declaration that she believed she would be terminated if she did not answer the detectives' questions, the court found her assertion was not "objectively reasonable" based on the interview transcript as a whole, particularly the absence of any suggestion by the detectives that appellant was required to talk to them, and the absence of any inquiry by appellant whether she was required to answer their questions or was under administrative investigation. The court placed "little weight" on the fact that "eight months after the interview" the Department took administrative action against appellant due to her failure to report for duty since her arrest and her involvement in a criminal

45

prosecution. The court found it "very clear that [the interview] was a criminal investigation[,] . . . exempt from [POBRA]," and that "[appellant's] statements were voluntar[y] up until she was advised of her *Miranda* rights and invoked them . . . ."

### 2. *Analysis*

In *Garrity*, *supra*, 385 U.S. 493, the United States Supreme Court held that a police officer may not be compelled to choose between providing unprotected incriminating testimony and losing his or her job. There, officers under investigation for fixing tickets were told they would be terminated if they refused to answer investigators' questions. The court held that the protection against coerced statements provided by the Fifth Amendment as incorporated in the Fourteenth Amendment "prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office . . . ." (385 U.S. at p. 500.)

Appellant appears to believe that *Garrity* applies to any statement made by a police officer during an interview conducted by fellow law enforcement officials. She is mistaken. "[T]he right against self-incrimination is not . . . violated until statements obtained *by compulsion* are used in criminal proceedings against the person from whom the statements were obtained." (*Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704, 727, italics added, italics omitted.) "[A]nswers freely given [by government employees] are not immune from use in criminal proceedings . . . ."" (*Evangelou v. District of Columbia* (D.D.C. 2012) 901 F.Supp.2d 159, 166.) Thus, appellant's statements were subject to suppression only if they were obtained by compulsion or coercion, rather than voluntarily given. We agree with the trial court that appellant's statements were voluntary.

46

In *Garrity*, the compulsion element was obvious: before being questioned each officer was told that "if he refused to answer he would be subject to removal from office." (*Garrity, supra*, 385 U.S. at p. 494.) Accordingly, some federal courts have held that "for [*Garrity*] to apply, the threat of a penalty for remaining silent must have been explicit" (*U.S. v. Corbin* (7th Cir. 1993) 998 F.2d 1377, 1390), and that absent an explicit threat of termination by the interrogators, there can be no compulsion and thus, no need to suppress. (See, e.g., *Dwan v. City of Boston* (1st Cir. 2003) 329 F.3d 275, 279 ["[C]oercion is lacking so long as the employee was never threatened or forewarned of any sanction for refusing to testify, even though the employee suffers adverse action after-the-fact as a result of refusing to cooperate."]; accord, *U.S. v. Palmquist* (1st Cir. 2013) 712 F.3d 640, 645; *U.S. v. Indorato* (1st Cir. 1980) 628 F.2d 711, 716; *Singer v. State of Maine* (1st Cir. 1995) 49 F.3d 837, 847.) In *U.S. v. Indorato*, for example, where the defendant -- a police lieutenant -- was convicted of theft of property and perjury, the court held that statements he made in response to joint questioning by his superiors and FBI agents were admissible because the defendant "was not in custody," there was "no overt threat that defendant would be dismissed if he refused to answer the questions asked," and a rule requiring officers to obey lawful orders did not suggest that "dismissal would . . . have automatically followed defendant's invocation of the fifth amendment." (628 F.2d at pp. 715-716.)

Others courts have applied a less restrictive test, holding that a police officer claiming the protection of *Garrity* "must have in fact believed [his] . . . statements to be compelled on threat of loss of job, and this belief must have been objectively reasonable." (*U.S. v. Friedrick* (D.C. Cir. 1988) 842 F.2d 382, 395; see, e.g., *U.S. v. Vangates* (11th Cir. 2002) 287 F.3d 1315, 1321-1322 ["In the absence of a direct threat, we determine whether the officer's statements were compelled by examining her belief and, more importantly, the objective circumstances

47

surrounding it."]; accord, *McKinley v. City of Mansfield* (6th Cir. 2005) 404 F.3d 418, 436; *U.S. v. Waldon* (11th Cir. 2004) 363 F.3d 1103, 1112; *U.S. v. Trevino* (5th Cir. 2007) 215 Fed.Appx. 319, 321; *U.S. v. Stein* (S.D.N.Y. 2006) 440 F.Supp.2d 315, 328; *U.S. v. Camacho* (S.D. Fla. 1990) 739 F.Supp. 1504, 1515.) For example, in *U.S. v. Trevino*, the defendant police officer was called in by his chief and instructed to talk to a Texas Ranger conducting a criminal investigation. (*U.S. v. Trevino, supra*, 215 Fed.Appx. at p. 320.) During the interview, the defendant admitted sexual misconduct with female arrestees; in a later criminal trial, he sought to suppress the statements. (*Ibid.*) The Fifth Circuit rejected the proposition that the absence of an explicit threat of discharge rendered the statement voluntary, concluding that "implied threats could violate a defendant's *Garrity* rights." (*Id*. at p. 321.) It found, however, that "[l]ooking at the objective circumstances surrounding [the defendant's] questioning, it is clear that he was not faced with '"the Hobson's choice of either making an incriminating statement or being fired . . . ."' [Citation.] [His] supervisors were not present during his questioning and never indicated to him that his job would be in any greater jeopardy if he failed to cooperate. . . . Further, [the defendant] was told before questioning began that he was free to leave the interrogation room at any time. Thus, the district court did not err in admitting his statement, as the statement did not implicate [his] *Garrity* rights." (*Id*. at p. 322, quoting *U.S. v. Vangates*, *supra*, 287 F.3d at p. 1321.)[40]

---

[40] For an example of a situation in which an officer interviewed by criminal investigators was found to have been subject to compulsion, see *U.S. v. Friedrick*, *supra*, 842 F.2d at pp. 395-397 [FBI employee who had been questioned multiple times by his employer in connection with an internal investigation reasonably believed he was compelled under threat of job sanctions to speak during interviews conducted by DOJ criminal investigators: he had been ordered to appear at the interviews by his FBI

*(Fn. continued on next page.)*

We need not resolve whether the threat of discharge must be overt, as here, the trial court found not only that there was no express compulsion, but that appellant had no objectively reasonable basis to believe she was compelled to answer the detectives' questions. The court's finding are supported by the record. Appellant was not directed by her superiors to submit to the interview. The detectives were not in her supervisory chain of command or even in her unit. They were not internal affairs investigators, and at no point did they suggest that appellant's job was in jeopardy if she refused to speak to them. They obtained her initial cooperation by using the ruse of needing help with an investigation, and then candidly informed her they wished to discuss her relationship with Ruetten and the Rasmussen homicide, which they referred to as the "case" they were "working on." Thus, it was clear that the interview was part of a criminal investigation. At no point did the detectives suggest that appellant was required to answer their questions or remain in the interview room. Nor did appellant do or say anything indicating she felt compelled to remain or to answer their questions. As a long-time police officer formerly assigned to internal investigations, appellant was familiar with the distinctions between criminal and internal investigations and the obligations imposed on officers by each. From the fact that the detectives did not provide her with a formal complaint or discuss her POBRA rights, appellant would have been aware that the questioning was not in connection with an internal affairs matter. The fact that she remained in the room answering questions does not support that she felt compelled, but only that she wished to allay suspicion by

superiors; the time gap between the two sets of interviews was brief; he had been told by his superiors that these were "'further interviews,'" not a separate criminal investigation; he had been informed from the beginning that FBI and DOJ were conducting a joint inquiry; and he had not been provided the written warning about use of incriminating statements generally given to employees providing voluntary statements].

avoiding behaving in a manner that suggested guilt. Under all the circumstances, her alleged subjective belief was not reasonable.

Appellant contends that California law imposes a duty on police officers to provide all information in their possession about criminal activity -- including their own -- and permits imposition of discipline if they fail to answer questions relating to a criminal inquiry. From this, she argues that any statement made by an officer -- even in a purely criminal investigation -- is necessarily legally compelled. For this novel proposition appellant relies primarily on a case decided over three-quarters of a century ago. In *Christal v. Police Commission* (1939) 33 Cal.App.2d 564, police officers discharged for refusing to appear before a grand jury to answer questions about corruption and receipt of bribes, filed a civil suit seeking to regain their employment. The court held that the officers could not exercise their constitutional privilege of refusing to testify under the circumstances presented "and still insist upon retaining their positions as police officers." (33 Cal.App.2d at p. 567.) The court explained: "When police officers acquire knowledge of facts which will tend to incriminate any person, it is their duty to disclose such facts to their superiors and to testify freely concerning such facts when called upon to do so before any duly constituted court or grand jury. . . . [I]t is a violation of said duties for any police officer to refuse to disclose pertinent facts within his knowledge even though such disclosure may show, or tend to show, that he himself has engaged in criminal activities." (*Id*. at pp. 567-568.) The officers "attempted to . . . claim an alleged right to continue as police officers despite a violation of their duties as such officers. It seems clear that they had no such right. [Citation.]" (*Id*. at p. 573.)

To the extent *Chrystal* stands for the proposition that an officer has a duty to disclose incriminating facts to a superior and to testify concerning such facts when called to do so in court or before a grand jury -- it is still good law, although post-

50

*Garrity*, it is clear that answers coerced by threat of termination cannot be used in subsequent criminal proceedings.[41] (See, e.g., *Gardner v. Broderick*, *supra*, 392 U.S. at p. 278 ["If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself[] [citation], the privilege against self-incrimination would not have been a bar to his dismissal."] *Pasadena Police Officers Assn. v City of Pasadena* (1990) 51 Cal.3d 564, 578 ["'[A] peace officer has no absolute right under the Constitution to refuse to answer potentially incriminating questions asked by his or her employer; instead, the officer employee's right against self-incrimination is deemed adequately protected by precluding any use of his or her statements at a subsequent criminal proceeding should such charges be filed.'"].) The rule has been modified further by our Supreme Court's decision in *Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822, which held that while a police officer who refuses an order to respond to questions is subject to punitive action by his employer, including discharge,

---

[41] To the extent *Christal* stands for the proposition that a police officer -- or any other public employee -- may be terminated for exercise of the Fifth Amendment privilege, it has been overruled by the United States Supreme Court. (See, e.g., *Uniformed Sanitation Men Assn., Inc. v. Commissioner of Sanitation* (1968) 392 U.S. 280, 283-285 [city employees cannot be discharged for invoking and refusing to waive their privilege against self-incrimination]; *Gardner v. Broderick* (1968) 392 U.S. 273, 278-279 [police officer could not be discharged for refusing to execute document purporting to waive constitutional rights and permit prosecution on the basis of his compelled testimony]; see also *Lefkowitz v. Cunningham* (1977) 431 U.S. 801 [declaring unconstitutional a state statute divesting official from holding political and public offices for refusing to waive privilege against self-incrimination when subpoenaed to testify concerning his conduct in office].) Public employees may constitutionally be discharged for refusing to answer potentially incriminating question only "if they have not been required to surrender their constitutional immunity." (*Id.* at p. 806.)

51

before penalties may be imposed, the officer must have been explicitly advised that "any statement made under the compulsion of the threat of such discipline could not be used against him in any subsequent criminal proceeding." (*Id*. at p. 829.)

During the June 5, interview, appellant had not been ordered to answer any questions and indeed, was not being interviewed by anyone in a position to issue such an order. Appellant, herself a former internal affairs officer, would have been aware that in the absence of a formal complaint or the explicit advisement required by *Lybarger*, she was under no danger of termination if she refused to cooperate with the detectives. In short, neither *Christal* nor any other case of which we are aware suggests that police officers' un-coerced and otherwise voluntary answers to questions posed in the course of a criminal investigation are legally compelled and thus inadmissible.

Appellant further contends that she was compelled by the provisions of POBRA to answer the detectives' questions. She relies on the language of subdivision (e) of Government Code section 3303: "The public safety officer under interrogation shall not be subjected to offensive language or threatened with punitive action, except that an officer refusing to respond to questions or submit to interrogations shall be informed that failure to answer questions directly related to the investigation or interrogation may result in punitive action." Appellant acknowledges that subdivision (i) of section 3303 states that "[t]his section shall not . . . apply to an investigation concerned solely and directly with alleged criminal activities," but argues that subdivision (i) must be interpreted to mean only that the procedural protections available to police officers under section 3303 are not available in criminal investigations. She claims her interpretation is supported by *Lybarger v. City of Los Angeles*, in which the court, citing subdivision (e) of section 3303, said: "[A]ppellant [a police officer] had no statutory right to remain silent." (*Lybarger v. City of Los Angeles, supra*, 40

Cal.3d at p. 827.) *Lybarger*, however, involved a police officer removed from his position for refusing to answer questions posed by internal affairs investigators. It nowhere suggested that an officer who refuses to respond to questions posed by criminal investigators is subject to employee penalties. (See also *Pasadena Police Officers Assn. v. City of Pasadena*, *supra*, 51 Cal.3d at p. 574 [POBRA applies "when a peace officer is interrogated in the course of an administrative investigation that might subject the officer to punitive action, such as 'dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment'"]; *Van Winkle v. County of Ventura* (2007) 158 Cal.App.4th 492, 499 ["The Legislature unambiguously delineated the investigations . . . subject to POBRA, such as disciplinary actions, from those which were not (e.g., . . . criminal investigations)."].)

This court's decision in *City of Los Angeles v. Superior Court* (1997) 57 Cal.App.4th 1506 makes clear that when subdivision (i) is triggered, the remaining provisions of section 3303 do not apply. There, as here, the officer contended that "[section 3303,] subdivision (i) does not modify the entire section." (*City of Los Angeles v. Superior Court,* 57 Cal.App.4th at p. 1513.) We rejected the argument, concluding that as "[t]he paragraph at issue begins with the words 'This section,' not 'this subdivision,'" the paragraph applied "to the entire section, as it states." (*Ibid*.) Thus, regardless of any statutory duty imposed on officers by subdivision (e) of section 3303 to answer questions posed in the course of an administrative investigation, under subdivision (i), no such duty applies when the investigation is "concerned solely and directly with alleged criminal activities." POBRA imposed no requirement on appellant to answer the detectives' questions, and she was under

no compulsion or coercion when she did so.  The trial court's ruling admitting the taped interview was correct.[42]

E. *Admission of MiniFiler Results*

1. *Background*

The primary DNA evidence connecting appellant to the crime was found in the saliva on the bite mark on Rasmussen's arm.  Appellant raised no objection to the introduction of this evidence, and raises no issue with respect to it on appeal.  She sought to exclude a small subset of the DNA evidence presented by the prosecution:  analysis of tissue found on and under Rasmussen's fingernails conducted by Fedor using a DNA test kit known as "MiniFiler."  MiniFiler testing led Fedor to conclude appellant was a "possible contributor" to partial DNA profiles found in his examination of the fingernails.  On appeal, she contends the evidence should not have been admitted because it was the product of a new scientific technique whose reliability had not been established by the prosecution or prior authority.  For the reasons discussed, we conclude the trial court did not err in admitting the evidence.  We first provide some background to assist in understanding the terms used in DNA analysis.

a. *DNA Analysis Overview*

DNA, the genetic material found in the nucleus of human cells, "is organized into 23 pairs of . . . chromosomes, 1 chromosome in each pair being inherited from the mother and the other from the father."  (*People v. Venegas*

---

[42] Because we find no error in the trial court's admission of the taped interview, we need not address respondent's argument that any error in admitting it was harmless in light of the other evidence of appellant's guilt.

(1998) 18 Cal.4th 47, 58 (*Venegas*).) Each chromosome is "in the shape of a spiral staircase [citation] . . . 'consist[ing] of two parallel spiral sides.'" (*Ibid*.) The two parallel spiral sides are connected by a series of "'rungs,'" consisting of a pair of chemical components called "bases." (*Id*. at pp. 58-59.) In most areas of the chromosome, "'the sequence of base pairs is the same for everyone.'" (*Id*. at p. 59.) In certain locations, however, the sequence varies from person to person. (*Ibid*.) A location -- or locus -- that is variable is "'polymorphic.'" (*Id*. at p. 59.) Scientists examining regions known to be polymorphic, "'have identified loci where a particular pattern of base pairs is repeated successively for numbers of times that vary from person to person.'" (*Nelson*, *supra*, 43 Cal.4th at p. 1258.) The greatest variations in base pair sequences are found at locations or loci containing "'variable number tandem repeats' (VNTR's)." (*Venegas*, *supra*, 18 Cal.4th at p. 59; *People v. Soto* (1999) 21 Cal.4th 512, 521.) "A specific pattern of base pairs at a given location on a given chromosome is called an allele." (Chin et al., *supra,* § 2:2, par. 7.) Alleles ""can be measured and compared to determine whether a suspect sample matches an evidentiary biological sample at each of the loci tested.'" (*Nelson*, *supra*, at p. 1258.)[43]

"Short tandem repeats" (STRs) are essentially VNTRs with smaller numbers of base pairs.[44] (See Chin et al., *supra*, § 2:3, 1st par.; *People v. Smith* (2003) 107

---

[43] A person has two alleles at each locus, one from each parent. (Chin et al., *supra*, § 2.2, par. 7.) "[E]ach allele is a number, representing the number of times a four-part sequence . . . is repeated at a particular locus. Thus, if a person's alleles at a certain locus are 20 and 22, that person inherited a 20-repeat allele from one parent and a 22-repeat allele from the other." (Andrea Roth, *Safety in Numbers? Deciding When DNA Alone* Is *Enough to Convict* (2010) 85 N.Y.U. L. Rev. 1130, 1135-1136.)

[44] "STRs are 'short' because they are only two to six chemical letters long, 'tandem' because they are on adjacent chromosomes, and 'repeat' because the pattern repeats." (Chin et al., *supra*, § 2:3, 1st par.)

Cal.App.4th 646, 655; *Commonwealth v. Rosier, supra,* 425 Mass. at p. 811 [685 N.E.2d at p. 742]; *U.S. v. Davis* (D. Md. 2009) 602 F.Supp. 658, 665; *U.S. v. Ewell* (D.N.J. 2003) 252 F.Supp.2d 104, 108.) One of the steps in STR analysis involves producing multiple copies of the subject DNA through a "'polymerase chain reaction'" (PCR), and the overall process of obtaining a profile from STRs is often referred to as "PCR-STR" testing or analysis.[45] (See *Nelson, supra,* 43 Cal.4th at p. 1258; *People v. Jackson* (2008) 163 Cal.App.4th 313, 323.) In the PCR-STR process, the first step is "extraction," in which DNA is extracted from tissue samples obtained from the crime scene. (See *People v. Jackson, supra,* 163 Cal.App.4th at p. 322; *People v. Hill* (2001) 89 Cal.App.4th 48, 56.) The DNA is then amplified using primers which essentially mimic the body's natural cell replication process.[46] (See *People v. Jackson, supra,* at p. 322; *People v. Smith, supra,* 107 Cal.App.4th at pp. 654-655.) The amplification process is repeated numerous times in order to yield millions of copies. (See *People v. Smith, supra,* at p. 654; *U.S. v. Davis, supra,* at p. 665; *U.S. v. Morrow* (D.D.C. 2005) 374 F.Supp.2d 51, 57.) Following amplification, typing takes place through "electrophoresis." (See *People v. Jackson, supra,* at p. 322; *People v. Smith, supra,* at p. 655.) Finally, "[t]he sample is run through an instrument that produces an electropherogram [--] a graphical representation of the DNA, including the number of repeats in STR alleles." (*People v. Stevey* (2012) 209 Cal.App.4th

---

[45] PCR-STR testing is "the current standard in the field." (Chin et al., *supra,* § 2:1, par. 2; see *District Attorney's Office for Third Judicial Dist. v. Osborne* (2009) 557 U.S. 52, 62 ["Modern DNA testing can provide powerful new evidence unlike anything known before. Since its first use in criminal investigations in the mid-1980s, there have been several major advances in DNA technology, culminating in STR technology."].)

[46] During this process, an estimate of the quantity of DNA present, or "quantitation," takes place. (Chin et al., *supra,* § 3:4.)

1400, 1408-1409.)  Computerized software is used to create and interpret the electropherograms.  (Chin et al., *supra*, § 3:4, p. 3-28; *People v. Smith*, *supra*, at p. 655-656; *State v. Wakefield* (2015) 9 N.Y.S.3d 540.)

To perform DNA analysis, criminalists use test kits containing all the necessary chemicals, primers and software.  (See *People v. Smith*, *supra*, 107 Cal.App.4th at p. 656; *U.S. v. Williams* (D. Hawaii 2013) 979 F.Supp.2d 1099, 1101.)  Kits manufactured by different companies may use different chemicals and primers or different software.  (*U.S. v. Williams, supra,* 979 F. Supp.2d at p. 1101; *People v. Jackson*, *supra*, 163 Cal.App.4th at p. 323; *People v. Hill, supra,* 89 Cal.App.4th at pp. 57-58.)  PCR-STR analysis in general, and the use of COfiler, Profiler Plus, and Identifiler test kits -- the kits used to analyze the bite mark tissue sample and many of the other tissue samples taken from the crime scene -- have been found by multiple appellate courts to be generally accepted in the scientific community.  (See, e.g., *People v. Hill*, *supra*, at pp. 53, 57 [Profiler Plus]; *People v. Smith*, *supra*, at pp. 671-672 [Profiler Plus in combination with COfiler]; *People v. Jackson*, *supra*, 163 Cal.App.4th at pp. 323-325 [Identifiler].)

In the present case, after analysis using the Identifiler test kit resulted in weak or partial profiles, Fedor re-tested certain tissue samples from the crime scene using a test kit called "MiniFiler."  Fedor's testimony at trial concerning the DNA found on or under Rasmussen's fingernails was based in large part on the MiniFiler results.  This is the DNA testing at issue here.

### b. *Appellant's Kelly Motion*[47]

Prior to trial, appellant moved the court to hold a *Kelly* hearing on the admissibility of DNA evidence developed using MiniFiler, contending that "MiniFiler [was] a completely new DNA analysis commercial kit" and "its analytical results have never been admitted in evidence over a *Kelly* challenge." She presented no expert declaration and submitted no scientific reports discussing MiniFiler. She quoted the manufacturer's Web site, stating: "As the world's first commercially available miniSTR kit, the [MiniFiler] increases your ability to obtain DNA results from compromised samples that previously would have yielded limited or no genetic data." In addition, appellant made a number of claims without citing any source: (1) MiniFiler uses a "new polymerase or new reaction base, not previously used in existing kits"; (2) MiniFiler uses "primers that are different from commercial kits previously used in DNA analysis" which "produce[] unpredictable results with respect to major vs. minor donors when analyzing mixtures," and "results in 'primer binding site mutation,' sometimes resulting in the dropout of one of the alleles, thereby affecting the analysis"; (3) MiniFiler "increases the PCR cycle in the amplification process from 28 to between 30 and 36, resulting in contamination, allellic dropout and, peak height imbalance, all of which affect the resulting analysis"; (5) "SERI used the [MiniFiler] kit to conduct analyses of low copy number samples of mixtures, i.e., samples containing more than one donor that contained less than 200 [picograms]

---

[47]     In *People v. Soto, supra,* 21 Cal.4th at p. 515, footnote 3, the Supreme Court explained that as *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 had been supplanted in federal jurisprudence, the foundational requirement formerly referred to as the *Kelly/Frye* test is now referred to as the *Kelly* test.

of template DNA"; and (6) "[t]here is a lack of scientific acceptance of MiniFiler for use on low level mixed samples."

The prosecution opposed the motion, confirming that Fedor had used MiniFiler to obtain certain results from Rasmussen's fingernails which would be offered into evidence, but contending that MiniFiler was a PCR-STR test kit whose technology was fundamentally unchanged from the COfiler, Profiler Plus and Identifiler test kits, which had been approved as generally accepted by prior court decisions. The prosecution cited *People v. Hill*, *supra*, 89 Cal.App.4th at p. 58, in which the court held that the Profiler Plus test kit was not a new technique or novel testing device, rejecting the argument that each "new PCR/STR test kit must, as a matter of law, be subjected to a *Kelly* prong one analysis to determine scientific reliability." Attached to the opposition were two articles from the Journal of Forensic Science: Hill, et al., "Concordance Study between the [MiniFiler] Kit and Conventional STR Typing Kits" (July 2007), and Luce, et al., "Validation of the [MiniFiler] Kit for Use in Forensic Casework" (September 2009), cited to support the contention that "[b]oth concordance studies and validation studies of the MiniFiler test kit have shown it to be both effective and reliable."[48]

---

[48]    According to the description in one of the studies: "The [MiniFiler] is designed to function as an adjunct DNA typing kit to current commercial [STR] typing kits, such as [Identifiler], in order to obtain a more complete genetic profile of an individual. MiniFiler is the first commercially available 9-plex miniSTR amplification kit for use on forensic casework when other DNA typing kits have proven to be unsuitable for the genotyping of highly degraded and inhibited DNA samples. . . .  The MiniFiler kit contains primers that amplify eight of the Identifiler kit's largest loci . . . , and the sex-typing locus . . . [¶] . . . The advantage that MiniFiler has over other commercial STR typing kits is the shorter amplicons (miniSTRs) that are produced during the polymerase chain reaction (PCR). MiniSTRs are the result of relocating the PCR primers as close as possible to the STR repeat region, reducing the flanking region and thus the overall size of the STR marker, consequently resulting in an increased success rate for obtaining a genetic profile from degraded DNA samples. . . . [¶] . . .  In addition to shorter amplicons,

*(Fn. continued on next page.)*

In reply, appellant contended: (1) the number of amplification cycles in the studies offered by the prosecution was 28 and SERI "may have employed" a greater number of cycles; (2) the studies did not involve an analysis of small amounts of DNA below the "stochastic threshold" and "a hearing [would] determine" whether SERI analyzed DNA amounts that fell below that threshold;[49] (3) the studies indicated a minimum amount of DNA, in the range of 0.2 to 0.6 nanograms, was necessary for an accurate result, and a hearing was needed to determine whether SERI analyzed samples containing lower amounts; and (4) DNA material examined in the studies was from individual swabs or samples containing at most two contributors, not multiple contributors as had been apparently analyzed by SERI. Appellant did not cite any source to support these allegations and did not explain their significance. Instead, the reply brief stated that "[a]t a hearing, an expert [would] explain" the significance of the allegations.

robust profiles are obtained from challenged samples due to the optimization of the amplification reaction, which aids in overcoming PCR inhibition, and the increased number of PRC cycles (30 cycles as compared to 28 cycles for the Identifiler kit), which increases the sensitivity and reduces the optimum DNA template requirement. . . ."

MiniSTR analysis was recently discussed in *U.S. v. MacDonald* (E.D.N.C. 2014) 37 F.Supp.3d 782, where an expert testified it is "'a methodology that may be used on degraded DNA samples to help recover information lost during conventional STR analysis,'" and explained: "'Degraded DNA can occur due to sample age, humidity, bacteria, chemicals, and/or environmental insults that affect the quality of the DNA. Degraded DNA often does not amplify during the PCR process, resulting in no results. MiniSTR analysis amplifies the same locations, however, utilizes smaller PCR products which enhances the recovery of the information from the sample.'" (*Id*. at p. 788.)

[49] In *U.S. v. McCluskey* (2013) 954 F.Supp.2d 1224, 1276-1277, the court described the """"stochastic threshold"""" as a laboratory-set number used to assess whether a sample contains sufficient DNA to obtain reliable results. In *U.S. v. Davis*, *supra*, 602 F.Supp.2d at page 668, the court quoted an expert who stated that the scientific community had not settled on a precise quantity as the stochastic threshold, but gave a "'ballpark'" figure of 0.125 nanograms. A nanogram is one-billionth of a gram.

Relying on *People v. Hill*, *supra*, 89 Cal.App.4th 48, the trial court found that the contentions raised by appellant were insufficient to trigger a *Kelly* hearing. The court pointed out that that "according to the *Hill* decision, the Profiler Plus test kit was challenged because it used different primers," which was one of the main differences between the MiniFiler and other test kits identified by appellant. The court observed that "the uniqueness of the Profiler Plus test kit compared to other test kits was actually more extreme than the MiniFiler test kit's uniqueness compared to the Identifiler and Profiler Plus test kits . . . ." During oral argument, defense counsel contended: "There are articles that question the reliability of MiniFiler and all that would come out at a hearing through expert testimony. [¶] So it seems to me, on the basis of the evidence before the court, the court can't reach the conclusion that this is governed by *Hill* without listening to some expert testimony." The court pointed out that the prosecution had submitted two peer review publications indicating successful testing of the MiniFiler whereas appellant had submitted nothing to support her allegations.

The court further ruled that a prong three hearing was unnecessary, but stated that "before the expert testifie[d]," it would entertain a motion for an Evidence Code section 402 [section 402] hearing "on whether or not appropriate and proper procedures were followed in the administration of the MiniFiler test . . . ." Additionally, the court stated: "[S]ince the People are going to be using the results of the MiniFiler test kit for some of the DNA evidence, [the defense is] going to want to try to attack that in front of the jury and explain to the jury why the jury should not rely on that evidence. . . [¶] . . .I think it becomes basically a

trial issue . . . ." There is nothing in the record to indicate that the defense sought a section 402 hearing prior to Fedor's testimony.[50]

### 2. *Analysis*

#### a. *Appellant failed to establish the necessity of a Kelly hearing*

Under the first prong of the *Kelly* test, the "admissibility of expert testimony based on 'a new scientific technique' requires proof of its reliability -- i.e., that the technique is '"sufficiently established to have gained general acceptance in the particular field to which it belongs"'' [citation]." (*Venegas*, *supra*, 18 Cal.4th at p. 76.) For purposes of the first prong, "'general acceptance' does not require unanimity." (*People v. Leahy* (1994) 8 Cal.4th 587, 601.) The second prong of the *Kelly* test requires that "any witness testifying on general acceptance be properly qualified as an expert on the subject. [Citation.]" (*Venegas*, *supra*, at p. 78.) The third prong requires "'the proponent of the evidence [to] demonstrate that correct scientific procedures were used in the particular case. [Citations.]'" (*Ibid.*, quoting *Kelly*, *supra*, 17 Cal.3d at p. 30.)

Because *Kelly* is applicable only to "'new scientific techniques'" (*People v. Leahy*, *supra*, 8 Cal.4th at p. 605), courts must make "the threshold determination of whether to conduct a *Kelly* hearing in the first instance." (*People v. Henderson* (2003) 107 Cal.App.4th 769, 776; see also *People v. Garcia* (2013) 39 Misc.3d

---

[50] During his testimony, Fedor described the MiniFiler test kit as a "PCR reagent kit that is particularly suitable for testing very small or degraded samples of DNA. It essentially takes the markers that in Identifiler are susceptible to degradation, that is, that don't give very much information in small quantities or degraded quantities, and focuses on getting information from those markers supplemental to the Identifiler reagent kit that allows us to fill in some areas where Identifiler may give weak or no results."

482, 484 [963 N.Y.S.2d 517, 519], quoting *State v. Harris* (Ariz. App. 1986) 730 P.2d 859, 861 [hearing is necessary "'only when the opposing party makes a timely request for such an inquiry supported by authorities indicating there may not be general scientific acceptance of the technique'"].)  In considering whether a technique is generally accepted, the trial court may look to published California decisions (*People v. Henderson*, *supra*, at p. 776), decisions from other jurisdictions, and "relevant scientific literature."  (*People v. Axell* (1991) 235 Cal.App.3d 836, 854.)  "[O]nce a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community."  (*People v. Kelly*, *supra*, 17 Cal.3d at p. 32.)  In other words, "case-by-case adjudication as to the 'general acceptance' prong of the *Kelly* test is not required once the scientific technique in question has been endorsed in a published appellate opinion."  (*People v. Morganti* (1996) 43 Cal.App.4th 643, 658.)

The issue of general acceptance in the relevant scientific community is a mixed question of law and fact.  (*People v. Morganti, supra,* 43 Cal.App.4th at p. 663; *People v. Stevey*, *supra*, 209 Cal.App.4th at p. 1410.)  In conducting our review, we rely primarily on the record below, but may also consider published legal opinions not considered by the trial court when it made its determination.  (*People v. Brown* (1985) 40 Cal.3d 512, 530; *People v. Reeves*, *supra*, 91 Cal.App.4th at p. 38; *People v. Allen*, *supra*, 72 Cal.App.4th at p. 1099.)

Where, as here, the issue is the novelty of a change in the method of analyzing DNA, courts have recognized that "[w]hat was once considered revolutionary has now become rather mundane," and the threshold issue is "whether the improvement or refinement in DNA methodology qualifies as another

breakthrough innovation within the meaning of *Kelly*, or whether the change represents a mere evolution of a generally accepted scientific technique." (*People v. Stevey*, *supra*, 209 Cal.App.4th at p. 1411.) As discussed, the PCR-STR method of analyzing DNA has been found to be generally accepted by many, many courts. (See, e.g., *People v. Jackson*, *supra*, 163 Cal.App.4th at pp. 323-325; *People v. Smith*, *supra*, 107 Cal.App.4th at p. 665; *People v. Hill*, *supra*, 89 Cal.App.4th at pp. 53, 57; *People v. Allen*, *supra*, 72 Cal.App.4th at p. 1099; *Commonwealth v. Rosier*, *supra*, 425 Mass. at p. 812 [685 N.E.2d at p. 743]; *U.S. v. Morrow, supra,* 374 F.Supp.2d at p. 61.) When a new kit utilizing the PCR-STR methodology comes onto the market, the issue is not whether there are differences between it and prior kits, but whether it significantly changes the methodology. (*People v. Jackson*, *supra*, 163 Cal.App.4th at p. 325; *People v. Hill*, *supra*, 89 Cal.App.4th at p. 58; see also *U.S. v. McCluskey, supra,* 954 F.Supp.2d at p. 1257 ["Courts addressing the use of new amplification and quantification kits have focused, not on the relatively minor differences between each kit, but instead on their common function in the application of DNA analysis."]; *U.S. v. Trala* (D.Del. 2001) 162 F.Supp.2d 336, 346 [observing that "the PCR process of amplifying relatively small samples of DNA into an analyzable quantity has received widespread acceptance in courts," and concluding that "'questions as to the reliability of the particular type of multiplex kit go to the weight of the evidence, rather than its admissibility'"].)

The Profiler Plus test kit at issue in *Hill* had a number of differences when compared to the previously accepted Promega test kit, including its examination of additional loci, its use of different primers, its use of fluorescent tagging to visually identify the targeted gene, and its new software. (*Hill, supra,* 89 Cal.App.4th at pp. 57-58.) In *Jackson*, the Identifiler kit was found to have similar differences from the COfiler and Profiler Plus kits that preceded it, and in addition, to

64

"reduce[] the amount of template DNA required" for analysis purposes.[51] (*Jackson, supra*, 163 Cal.App.4th at p. 324.) Nonetheless, in neither case did the court find the need for a prong one *Kelly* hearing. In *Jackson*, the court explained: "[T]he Identifiler test kit uses the PCR/STR testing methods, which have been generally accepted by the scientific community. Although defendant has identified seven changes in the Identifiler kit from the previous test kits, defendant has not shown that these differences change the methodology of the testing of the DNA. The changes . . . appear to increase the accuracy and efficiency of the same methodology of PCR/STR testing. The Identifiler test kit appears to be a more sensitive test, able to use less template DNA and reaction volume to genetically type more loci using a broader range of fluorescent color dyes. . . . [I]t appears Identifiler is a new and improved version of the same scientific procedure already generally accepted by the scientific community." (*Id*. at p. 325, italics deleted.) The defendant had expressed concern about the test's introduction of "non-nucleotide linker[s]'" but "admit[ted] to not knowing what the substance is and merely speculate[d] the non[-]nucleotide linkers might interfere with the evaluation of mixed samples." (*Ibid*.) Accordingly, the court concluded, the defendant had failed to show "the use of non[-]nucleotide linkers makes the Identifiler test a materially distinct scientific technique." (*Ibid*.)

Appellant here likewise failed to establish that MiniFiler represented a new technique or methodology, or that there was any question of its acceptance in the DNA testing community. In her original moving papers, appellant claimed without

---

[51]    "Low template" DNA testing, also known as "low copy number" or "LCN" testing, refers to tests performed on "amounts of DNA that are at or below the 'stochastic threshold.'" (*U.S. v. Davis, supra*, 602 F.Supp.2d at p. 668; see *U.S. v. Grinnage* (3d Cir. 2012) 486 Fed.Appx. 325, 329.)

attribution that the MiniFiler test kit used new bases and primers and increased the number of amplification cycles. She did not explain how these alleged differences made MiniFiler materially distinct from the Identifiler or other test kits. She quoted the manufacturer's Web site representing that MiniFiler would obtain DNA results from compromised samples that previously would have yielded limited genetic data, but the fact that the company's marketing material promised that its product was better than other comparable products does not establish that this was a new methodology. She claimed that SERI used MiniFiler "to conduct analyses of low copy number samples of mixture, i.e., samples containing more than one donor that contained less than 200 [picograms] of template," but if she believed this to be an inappropriate use of the test kit, she remained free to question Fedor in a prong three or section 402 hearing.

Appellant's reply papers contained similar defects. She made a number of unattributed contentions and accused SERI of possibly inappropriate uses of MiniFiler, such as analyzing low template DNA, employing a greater number of amplification cycles than was optimal, and processing DNA mixtures from more than two contributors. She promised that "an expert" would "explain the significance" of these contentions "at a hearing." She did not indicate she was quoting an expert or had consulted an expert with respect to any of the topics discussed in her moving papers, nor did she identify an expert prepared to testify that MiniFiler was an entirely new and untested technology on which DNA scientists did not agree. She thus failed to provide any basis for her assertion that MiniFiler was a fundamentally different PCR-STR test kit, and the trial court had no obligation to order a *Kelly* hearing.

We find support for our conclusion in *People v. Borden* (2011) 90 A.D.3d 1652 [935 N.Y.S.2d 810]. There, the court rejected the defendant's contention that the trial court erred in failing to conduct a *Frye* hearing to determine the

66

admissibility of DNA results obtained through use of a MiniFiler kit, explaining that prior to trial, the prosecution presented uncontradicted evidence that "the MiniFiler test is simply a more advanced form of traditional polymerase chain reaction/short tandem repeat testing, which this Court and others have long recognized as having gained general acceptance in the scientific community." (*Id.* at p. 1653.) Similarly, in *People v. Garcia, supra,* 39 Misc.3d 482 [963 N.Y.S.2d 517], the court addressed whether a *Frye* hearing was required before the prosecution could introduce the results of low copy number DNA testing. The court found that the defendant "fail[ed] to meet the initial threshold" because he had provided no support for his assertion that low copy number DNA testing "is generally not acceptable in the scientific community." Here, the only evidence before the court at the time of the hearing consisted of the studies introduced by the prosecution, which essentially described MiniFiler as a refined version of Identifiler, equally reliable and yielding similar results. In her briefs on appeal, appellant repeatedly claims to have made an "offer of proof" and to have "proffered testimony by [the] defense expert" to establish otherwise. In fact, appellant made no offer of proof and proffered no testimony. She made a number of unsupported allegations and, at best, intimated she would be able to locate an expert at a later date should the court schedule a hearing. On this record, the court had no obligation to hold a *Kelly* hearing.[52]

---

[52] Appellant contends the recent decision in *U.S. v. McCluskey, supra,* 954 F.Supp.2d 1224 supports her position. The testing in *McCluskey* did not involve MiniFiler. The test kits challenged by the defendant there were Identifiler and Quantifiler, and the court concluded that because they both used PCR-STR methodology, any questions about them went to the weight of the DNA evidence, not its admissibility. (*McCluskey, supra,* at pp. 1256-1257.) The court also addressed "whether the [low copy number] testing performed *in this case, by the NMDPS [New Mexico Department of Public Safety] Lab,* [was] reliable." (*Id.* at p. 1279, italics added.) The court concluded it

*(Fn. continued on next page.)*

b. *Appellant forfeited any error with respect to whether proper procedures were utilized by SERI when she failed to request a prong three or Evidence Code section 402 hearing prior to Fedor's testimony*

At the hearing on appellant's *Kelly* motion, the court found no need for "a full blown prong three . . . *Kelly* hearing," but stated that it would "entertain [an Evidence Code section] 402 hearing on whether or not appropriate and proper procedures were followed in the administration of the MiniFiler test before the expert testifies or before trial, if we can make the arrangements." After learning from the prosecutor that the expert was from out of town and charged thousands of dollars per day to testify, the court stated: "We'll do a hearing before he testifies . . . ." However, when the time came for Fedor to testify, defense counsel did not request a section 402 hearing.

The third *Kelly* prong requires the proponent of the evidence to "'demonstrate that correct scientific procedures were used in the particular case. [Citations.]'" (*Venegas*, *supra*, 18 Cal.4th at p. 78, quoting *Kelly*, *supra*, 17 Cal.3d at p. 30.) The third prong "inquires into the matter of whether *the procedures actually utilized in the case* were in compliance with that methodology and technique, as generally accepted by the scientific community." (*Venegas*, *supra*, at p. 78.) The section 402 hearing offered by the court provided appellant the

---

was not, finding, among other things, that the NMDPS lab did not modify its procedures when testing a low copy number samples by, for example, increasing the amplification cycles (*id*. at p. 1282) or modify its statistical formulas to account for the possibility of alleles dropping out in analyzing the profile to determine whether it matched the defendant's. (*Id*. at p. 1283.) Nor had it performed internal validation for its low copy number testing or received certification for it. (*Id*. at p. 1280.) Because of the limited nature of the court's holding, we find little in *McCluskey* to assist our analysis.

functional equivalent of a prong three hearing without the necessity of incurring the expense of having the expert fly in for a separate hearing. Appellant's failure to request an opportunity to question Fedor outside the presence of the jury about the scientific procedures he used in conducting the MiniFiler analysis forfeited this issue. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 [defendant who failed to obtain definitive ruling from court on admissibility of evidence failed to preserve the issue for appeal].)

c. *Assuming introduction of the DNA evidence obtained through the MiniFiler test kit was error, it was harmless*

Although we conclude the trial court did not err in denying the *Kelly* motion, we find no basis to believe that any erroneous admission of the DNA evidence obtained through MiniFiler testing could have prejudiced appellant.[53]

Appellant was identified as the likely culprit through DNA analysis of saliva left on a bite mark on Rasmussen's arm. Her DNA profile precisely matched the profile of the person who bit Rasmussen shortly before her death. As serologist Fedor testified, the chance that a woman unrelated to appellant would have the same DNA profile as the bite mark swab at all 15 loci was approximately one in 1.7 sextillion, many times the population of the earth. Appellant had a compelling

---

[53]     "It is . . . well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. (Evid. Code, §§ 353, subd. (b), 354.) '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836.)

motive to kill Rasmussen. She had been abruptly dropped by Ruetten, with whom she had been intimate for several years and with whom she was in love, when he met his future wife. Upon learning of the engagement, appellant was distraught. She called Ruetten, crying, and begged him to come to her apartment, where she professed her love for him. She thereafter turned her anguish on the object of Ruetten's affections, confronting Rasmussen at her place of work and revealing to her Ruetten's prior infidelity. She confessed to her roommate, wrote in her journal, and confided in a letter to Ruetten's mother her deep-seated unhappiness and distress over Ruetten's marriage to Rasmussen. The circumstantial evidence was very strong: appellant was off work the day of the killing, she had no alibi, the gun used to commit the murder was consistent with a gun owned by appellant, and the bullets used were LAPD-required ammunition. Within weeks, appellant reported a gun that matched the likely murder weapon stolen, but only to Santa Monica police, not to her own department, which was investigating the murder. Her stories concerning how and when the gun was stolen were inconsistent. She proffered no explanation for how her DNA came to be present on Rasmussen's body. The evidence of motive and the circumstantial evidence, combined with the presence of appellant's DNA on a wound inflicted on the victim during her struggles with her assailant, provided convincing evidence of appellant's guilt. The MiniFiler evidence indicating that her profile partially matched DNA found on or under Rasmussen's fingernails at certain alleles was, at best, merely corroborative of the evidence of the bite mark DNA.

Appellant points out that in rebuttal, the prosecutor argued that the MiniFiler evidence eliminated any doubt that appellant committed the crime. After discussing the gun, the bullets, and the bite mark DNA which he contended supplied proof "without much doubt whatsoever," the prosecutor briefly discussed the fingernail DNA evidence, describing it as "not nothing" and having

70

significance in conjunction with the other evidence. He also argued it undercut any claim that the bite mark swabs had been tampered with because the fingernails had stayed with LAPD while the bite mark swabs were stored at the coroner's office. But appellant presented no serious evidence of tampering. While the envelope containing the test tube and swabs had developed a small tear over the years, and appellant raised questions about the accuracy of the coroner's evidence log indicating no one had touched the test tube in the years between 1986 and 2005, she presented no evidence that someone in or having access to the coroner's office had a motive to frame her and no explanation for how tampering with the swabs collected in 1986 could have resulted in her DNA and Rasmussen's DNA being found on them in two separate tests. Considering the prosecutor's argument in context, the DNA fingernail evidence was not critical, and even assuming the trial court should have excluded it in the absence of a *Kelly* hearing, any error was harmless.

F. *Evidence of Third Party Culpability*

1. *Background*

During opening statements, defense counsel indicated his intention to present evidence of a burglary that occurred in Rasmussen's neighborhood in April 1986. The court subsequently warned counsel that there would have to be "remarkable similarities" before the evidence could come in and questioned why the matter had not been resolved prior to trial. The next day, the prosecution filed a motion to exclude third party culpability evidence. The moving papers contended that the April burglary was "markedly different" from the crime at issue, and that there was "no direct or circumstantial evidence linking [any] third person to Ms. Rasmussen's murder."

According to police reports, on April 11, 1986 -- six weeks after the murder -- a residential burglary occurred on Balboa Boulevard, over a mile from Rasmussen's condominium.  The victim's condominium was similar to Rasmussen's in that both had locked security gates and stairs leading from the garages to the condominiums.  The victim, Lisa Rivalli, told the detectives that she had been home alone the day of the burglary due to illness.  After someone rang her doorbell several times that morning, she looked out her peephole and saw an unfamiliar Hispanic male.  She did not open the door.  When she left later in the day, a younger Hispanic male in a blue station wagon seemed to be watching her.  When she returned, her front door had been forced open.  Standing at the threshold, she saw the same Hispanic male who had been sitting in the blue car, now putting stereo equipment by the garage stairs into a bag.  He ran past her, out the front door and the security gate.  A second Hispanic male came downstairs carrying a gun, described by the victim as a .38, with a four-inch barrel.  Rivalli turned and ran.  The armed burglar also ran.  Rivalli observed paper stuffed into the locks of the outside security doors, apparently placed there to keep them from locking shut.  Many items on the upper floor of the condominium had been rifled or disturbed, including a typewriter, a jewelry box, a dresser and a hope chest.  The culprits escaped with some of Rivalli's jewelry.

The trial court concluded the evidence did not meet the standard for third party culpability evidence and excluded it.  The court found certain similarities, including that the killing took place in the daytime and the April burglary was a daytime crime.  Stereo equipment was involved in both crimes, as was a gun.  However, the court found that the differences prevailed.  The April burglars forced their way inside; Rasmussen's home showed no sign of forced entry.  The burglars ransacked Rivalli's bedroom, and took jewelry; Rasmussen's home showed no evidence the intruder sought jewelry.  The burglars left Rivalli's home in their own

72

vehicle; Rasmussen's assailant left in hers. Finally, the burglars, upon being discovered by Rivalli, fled without discharging a weapon. Rasmussen's assailant brutally beat her, bit her and shot her to death. The court found the "critical feature" to be that nothing linked the suspects in the April burglary to the Rasmussen homicide.

When crime scene analyst Mark Safarik testified concerning whether the crime scene had been staged to look like a burglary, defense counsel argued that the court's ruling on the inadmissibility of evidence pertaining to the April burglary precluded him from effectively cross-examining the witness. The court disagreed, stating that Safarik's testimony was based solely on his observations of the crime scene, not on an analysis of burglaries in the area, and noted that counsel was free to cross-examine the witness concerning his observations.

### 2. *Analysis*

"'A criminal defendant has a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about his own guilt.'" (*People v. Panah*, *supra*, 35 Cal.4th at p. 481, quoting *People v. Sandoval* (1992) 4 Cal.4th 155, 176.) This rule does not, however, ""'require that any evidence, however remote, must be admitted to show a third party's possible culpability. '"" (*Ibid*.) "[T]he standard for admitting evidence of third party culpability [is] the same as for other exculpatory evidence: the evidence [has] to be relevant under Evidence Code section 350, and its probative value [can]not be 'substantially outweighed by the risk of undue delay, prejudice, or confusion' under Evidence Code section 352." (*People v. Kaurish* (1990) 52 Cal.3d 648, 685.) Moreover, the evidence ""'must link the third person either directly or circumstantially to the actual perpetration of the crime.'"" (*People v. Edwards* (2013) 57 Cal.4th 658, 729.) ""'In assessing an offer of proof relating to such evidence, the [trial] court

73

must decide whether the evidence could raise a reasonable doubt as to defendant's guilt and whether it is substantially more prejudicial than probative under Evidence Code section 352."'" (*Ibid.*) We review the trial court's ruling on the admissibility of third party culpability evidence for abuse of discretion. (*People v. Prince* (2007) 40 Cal.4th 1179, 1242.)

The trial court's decision to reject the proposed evidence because the details of the April 1986 burglary did not bear sufficient similarities to the details of the Rasmussen homicide was a reasonable one. In a neighborhood as large and densely populated as Van Nuys, where both condominiums were located, burglaries are common. That both the Rasmussen homicide and the burglary six weeks later took place inside townhouse-style condominiums with garages and involved (or appeared to involve) attempts to steal stereo equipment does not make them distinctive or suggest that the two crimes were connected. Both crimes involved armed culprits, but if we accept Rivalli's description of the gun as a .38 caliber, we must also accept her statement that it had a longer barrel than the gun used in the Rasmussen homicide. The April burglars took care to ensure the residence was empty, watching the occupant leave before attempting to enter and forcing the door open. They ransacked the bedroom and stole jewelry. When confronted, the burglars, though armed, fled in their own vehicle. The dissimilarities between the April burglary and the assault on Rasmussen are striking, and the trial court was well within its discretion in concluding appellant had failed to raise a reasonable inference that the April burglary was in any way connected to Rasmussen's murder.

Appellant contends the trial court's evidentiary ruling deprived him of his constitutional right to "confront[]" or effectively cross-examine the prosecution's crime scene analyst. A similar argument was made in *People v. Abilez* (2007) 41 Cal.4th 472, where the defendant argued that the exclusion of evidence of his co-

defendant's decades-old juvenile sexual offense violated his constitutional right to present a defense, by denying him the opportunity to effectively cross-examine the co-defendant to establish that it was he who sodomized and killed the victim. (*Id*. at pp. 498-503.)  The Supreme Court rejected the contention that "the excluded evidence was 'so vital to the defense that due process principles required its admission," concluding instead that its exclusion "was a garden-variety evidentiary issue under state law" that "did not implicate defendant's federal constitutional right to present a defense."  (*Id*. at p. 503; see *People v. Prince*, *supra*, 40 Cal.4th at p. 1243, quoting *People v. Robinson* (2005) 37 Cal.4th 592, 626-627 [rejecting defendant's claim that exclusion of proffered third party culpability evidence violated his federal constitutional rights to present a defense and to confront and cross-examine witnesses:  "'There was no error under state law, and we have long observed that, "[a]s a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's [state or federal constitutional] right to present a defense."'"].)  Cross-examining Safarik about a specific burglary that occurred on a later date in a different location would have had little bearing on the validity of his opinions and conclusions concerning the Rasmussen crime scene. The trial court did not err in excluding the evidence and did not violate appellant's constitutional right to confront a witness or present a defense.

G. *Summary*

Certain facts were largely uncontradicted at trial and were demonstrated through the introduction of evidence whose admission is not challenged on appeal. Critical among them were:  (a) that appellant, deeply in love with Ruetten, was devastated by his decision to marry Rasmussen; (b) that appellant directed her anger not at Ruetten, but at Rasmussen, confronting her at her place of work; and (c) that appellant's DNA appeared in the saliva of the bite mark inflicted on

75

Rasmussen's forearm near the time of her murder. These facts alone raise the nearly inescapable inference that appellant confronted, assaulted and murdered Rasmussen.

Appellant does not claim the decades-long delay in matching her DNA to that found in the bite mark was intentionally designed to secure a tactical advantage, and her showing of prejudice was minimal. We discern no error in the trial court's determination that the substantial justification for the delay outweighed any marginal prejudice demonstrated by appellant, and that she failed to establish a violation of her due process rights.

Similarly, the passage of time did not preclude the magistrate judges from determining that the search warrants issued for appellant's home and computer were supported by probable cause. The motive for the crime -- appellant's obsession with Ruetten and desire to continue their relationship -- supported the inference that she would have retained items relating to him, including photographs uploaded to a computer. In any event, as the trial court found, the officers conducting the searches relied in good faith upon the issuance of the warrants. Appellant demonstrated no material misrepresentations in the affidavits in support of the warrants to merit a *Franks* hearing.

Appellant's interview statements were voluntarily made in the course of what any officer in her position would have recognized as a criminal investigation. Neither POBRA nor any other law rendered her statements legally compelled. We expressly reject appellant's suggestion that a law enforcement officer questioned in the course of a criminal investigation is automatically entitled to use immunity for statements voluntarily made.

Appellant failed to demonstrate the court erred in declining to hold a prong one *Kelly* hearing on the DNA evidence derived from the use of the Minifiler kit. Appellant made no offer of proof that the scientific techniques employed by the

Minifiler were either sufficiently different from, or substantially less reliable than, other DNA testing previously deemed admissible. And she forfeited any challenge to the reliability of the actual testing by failing to avail herself of the court's offer to hold a section 402 hearing. Most significantly, the probative value of the evidence derived from the Minifiler testing was marginal, and any error in its admission was necessarily harmless.

Finally, the trial court acted well within its discretion in rejecting appellant's proffered evidence of third party culpability based on the burglary of another condominium six weeks after Rasmussen's murder. The circumstances of that burglary -- in which the intruders waited for the occupant to leave, forced entry, stole jewelry, and upon being detected fled in their own vehicle -- differed radically from those of the instant crime, where the assailant gained unforced access to the residence while the occupant was home, took no jewelry, but assaulted, bludgeoned and shot the victim to death, before leaving in the victim's car.

For similar reasons, appellant demonstrated neither a violation of her state or federal constitutional rights nor evidentiary error in the trial court's ruling precluding her from cross-examining the prosecution's crime scene expert on the unrelated burglary.

## DISPOSITION

The judgment is affirmed.

## CERTIFIED FOR PUBLICATION

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

COLLINS, J.